963 P.2d 843 (1998)
136 Wash.2d 498
STATE of Washington, Respondent,
v.
Joey C. ELLIS, Petitioner.
No. 65761-1.
Supreme Court of Washington, En Banc.
Argued March 24, 1998.
Decided October 1, 1998.
*844 Rita Griffith, Seattle, for Petitioner.
John Ladenburg, Pierce County Prosecutor, Gerald T. Costello and Barbara Corey-Boulet, Deputy Pierce County Prosecutors, Tacoma, for Respondent.
SMITH, Justice.
Petitioner Joey C. Ellis seeks discretionary review of an order of the Pierce County Superior Court dated July 29, 1997 granting Respondent State of Washington's motion in limine to exclude expert testimony on diminished capacity and denying Petitioner's motion to allow the testimony in a pending trial in which Petitioner is charged with two counts of aggravated murder in the first degree and in which the State seeks the death penalty. We granted review on September 4, 1997 staying Petitioner's trial which had been scheduled for September 15, 1997. We reverse the Superior Court.

QUESTION PRESENTED
The question presented in this case is whether the trial court erred in excluding proffered defense expert testimony on diminished capacity, thus denying Petitioner an opportunity to establish a diminished capacity defense.

STATEMENT OF FACTS
On February 16, 1996, the Pierce County Prosecuting Attorney filed a corrected information in the Pierce County Superior Court charging Petitioner Joey C. Ellis with two counts of aggravated first degree murder[1] for the deaths of his mother, Lindy Lou Ellis, and his two-year-old half-sister, Jaime Jane Ellis.[2] The information states that on or about January 8, 1996 Petitioner, with premeditated intent,[3] bludgeoned his mother *845 and half-sister to death with a breadboard.[4] The information claimed as an aggravating circumstance that "the murders were part of a common scheme or plan, or the result of a single act of the defendant, or `...' was [sic] committed in the course of, in furtherance of, or in immediate flight from Robbery in the First or Second Degree...."[5]
On September 19, 1996, the State filed a discovery motion for disclosure of any mental defense Petitioner intended to present at trial. The State acknowledged receipt from Petitioner, as part of a mitigation package, of a report by Dr. Lloyd I. Cripe, Ph.D., a clinical neuropsychologist. The State observed that "Dr. Cripe discusses in detail his analysis of the [Petitioner's] state of mind when he killed the victims. However, Dr. Cripe does not address, one way or the other, the question of diminished capacity. Based upon past experience and the nature of this caselegally and factuallythe [State] anticipates that diminished capacity (or even insanity) will be raised at trial."[6]
On September 23, 1996, the State filed a notice of intent to seek the death penalty, stating that "either no mitigating circumstances have been brought to the attention of this office, or such mitigating circumstances as have been submitted have been received and considered and are not sufficient to merit leniency."[7] By letter dated January 3, 1997, Petitioner's assigned counsel informed the State of his diminished capacity defense, naming three psychologists as expert witnesses, "Mark Whitehill, Ph.D., Lloyd Cripe, Ph.D., and Jon Conte, Ph.D."[8]
In his mitigation report dated August 7, 1996, Dr. Cripe stated that he reviewed police reports and records, interviewed a close family friend, interviewed Petitioner's probation officer, and conducted a neuropsychological evaluation of Petitioner. He determined that Petitioner "suffered extreme psychological pain and a damaged self-esteem" as a result of growing up in a very dysfunctional and abusive environment.[9]
In an addendum to his report dated January 2, 1997, Dr. Cripe determined that Petitioner suffered from a "mental illness related to a long history of child and adolescent abuse which combined with drug abuse and the circumstances the night of the homicides resulted in a diminished capacity to normally control his mind and behavior." Dr. Cripe recommended that Petitioner "be defended with an understanding [sic] a diminished capacity at the time of his extreme actions."[10]
In a summary of findings dated January 3, 1997, Dr. Mark B. Whitehill, Ph.D., clinical and forensic psychologist, stated that he reviewed taped statements Petitioner made to the police following his arrest, examined the results of Petitioner's polygraph examination, interviewed a long-time family friend, and conducted a battery of psychological tests of Petitioner. He concluded that Petitioner satisfied the "statutory criteria ... in State v. Edmon, 28 Wash.App. 98, 621 P.2d 1310 (1981) for diminished capacity defense".[11]
On June 4, 1997, the State filed a motion in limine to exclude or limit expert testimony.[12] On June 7, 1997 Petitioner filed a motion to admit expert testimony on diminished capacity.[13] Both parties cited a 1981 Court of Appeals decision, State v. Edmon,[14] which stated nine foundational requirements for admitting expert testimony on diminished capacity. At a hearing before the Honorable Vicki L. Hogan on June 16, 1997, defense *846 counsel elected not to call witnesses, but relied upon their written motions. The State called as "hostile witnesses" defense experts Dr. Conte, Dr. Cripe and Dr. Whitehill and appropriately asked leading questions. Over defense objections, the court allowed testimony by Dr. Greg J. Gagliardi, Ph.D., of Western State Hospital, who gave his opinion concerning the appropriate methodology for diagnosing diminished capacity and application of "Edmon factors" in psychological diagnosis.[15] In an oral ruling on June 17, 1997, Judge Hogan granted the State's motion in limine to exclude the testimony of defense expert witnesses Dr. Conte, Dr. Cripe and Dr. Whitehill.[16] Petitioner moved for reconsideration, requesting the court to allow an offer of proof through further testimony and declarations.[17] The court granted the motion. After hearing the testimony of Dr. Cripe on July 28, 1997, Judge Hogan affirmed her prior ruling.[18] The court did not allow further testimony from Dr. Whitehill, determining there was "nothing new in Dr. Whitehill's July 23rd declaration that indicates anything new than as testified."[19]
On July 29, 1997,[20] Judge Hogan signed an order granting the State's motion in limine to exclude or limit expert testimony and denying Petitioner's motion to admit expert evidence on diminished capacity.[21] On August 8, 1997 Petitioner sought discretionary review by this Court.[22] Review was granted on September 4, 1997.[23]

DISCUSSION
The usual rule is that admissibility of evidence is within the sound discretion of the trial court and the court's decision[24] will not be reversed absent abuse of that discretion.[25] "An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court."[26]
Petitioner asserts that diminished capacity is a mental condition, not amounting to insanity, that causes an inability to form the requisite intent for the crime charged.[27] Citing State v. Eakins, Petitioner acknowledges that for a defendant to maintain a diminished capacity defense, the defendant must present expert testimony establishing a mental disorder that impaired the ability to form the specific intent[28] to commit the offense charged.[29] Petitioner argues that determination of the credibility of expert witnesses is for the jury.[30]
Asserting that State v. Edmon establishes the foundational criteria for admitting the opinion of an expert regarding a defendant's ability to form a specific intent, Petitioner argues that he has satisfied all nine "Edmon factors"[31] and therefore the trial court erred in excluding his expert testimony.
*847 Petitioner argues that "Edmon factor" one has been satisfied because, in the expert opinion of Dr. Cripe, Petitioner could not have formed a specific intent at the time of the killings.[32] Petitioner contends that "Edmon factor" two has been satisfied because the experts' qualifications were not challenged and the court, either expressly or implicitly, acknowledged that the experts were qualified to testify.[33] Petitioner argues that "Edmon factor" three has been satisfied through the testimony of Dr. Whitehill on June 16, 1997 and Dr. Cripe on July 28, 1997, when they stated that they examined and diagnosed Petitioner and were able to state an opinion with reasonable medical certainty.[34]
According to Petitioner, the expert testimony is based upon substantial supporting evidence in the record and therefore "Edmon factor" four has been satisfied. Dr. Whitehill testified he relied on his discussions with Petitioner and additional information, including a previous mental health examination.[35] Dr. Cripe testified he relied upon examination of Petitioner and "records surrounding the case and the police and legal aspects of the case." He stated he received "some input from Dr. Whitehill," and interviewed a woman with whom Petitioner and his mother had lived and interviewed Petitioner's grandfather.[36]
Petitioner contends he has satisfied "Edmon factor" five because expert testimony concluded his mental disorder, and not ordinary emotions, prevented him from forming a specific intent. Dr. Whitehill testified he would characterize Petitioner's personality disorder on multiple levels, a behavioral component, a cognitive component, an interpersonal relations component, and an emotional component.[37]
During his testimony, Dr. Cripe explained that Petitioner was not experiencing mere transient emotion, but the emotion was a component of an underlying mental disorder.[38]
Arguing that "Edmon factor" six has been satisfied, Petitioner contends defense experts explained that his mental disorders caused his inability to form intent. Dr. Whitehill testified that Petitioner experienced an aberrant reaction, "We are talking about extreme pathology here, and breakdowns of mental observations that are not just an overreaction. We are talking about defects of mental functioning."[39] Dr. Cripe explained that, due to the unusual and extraordinary nature *848 of the crime, he believes Petitioner was not merely experiencing reduced perception or other irrelevant mental states.[40]
Petitioner asserts that "Edmon factor" seven has been satisfied because in Dr. Whitehill's expert opinion, Petitioner's inability to form a specific intent occurred at the time of the killings.[41] Petitioner also refers to Dr. Cripe's statement that "when the situation evolved that night and interacted with [Petitioner's] mental defect and impairment, there was just a breakdown in the way the mind works and the way the mind would normally prethink or deliberately reason things out and think about cause and effect and then make a decision."[42]
Petitioner argues that the testimony of Dr. Whitehill and of Dr. Cripe satisfies "Edmon factor" eight, which requires that the mental disorder must substantially reduce the probability that Petitioner formed the necessary intent. Dr. Whitehill described Petitioner's ability to form specific intent as "severely compromised" and estimated that Petitioner's capacity to form intent was roughly at 25%, or reduced by 75%.[43] Dr. Cripe testified that Petitioner's mental disorders substantially reduced the probability that Petitioner formed the necessary intent.[44]
Petitioner contends "Edmon factor" nine has been satisfied because defense experts explained how his mental disorders caused an inability to form specific intent. Dr. Whitehill testified that, in his professional opinion as a forensic psychologist, Petitioner suffered diminished capacity on the night of the killings.[45] In a declaration dated July 28, 1997, Dr. Cripe concluded that what happened on the night of the killings was not premeditated or intended.[46]
Petitioner concludes that because all nine foundational requirements of Edmon have been satisfied, the trial court erred in excluding the expert testimony of Dr. Whitehill and Dr. Cripe. According to Petitioner, this case and State v. Edmon are "virtually indistinguishable." Petitioner argues that in Edmon, the Court of Appeals reversed the defendant's conviction because the trial court excluded expert testimony similar to testimony excluded in this case.
In Edmon, the defendant, who filed a grievance against his supervisor, believed he was a victim of racial discrimination. One night he arrived at work after drinking and partying and entered into an angry discussion with his supervisor. The defendant threatened, hit, and shot his supervisor in the stomach. One hour later, the defendant had a blood alcohol reading of .13. At trial, the defendant testified he had only three hours of sleep during the 24 hours preceding the shooting and that he could not recall the incident.[47] The trial court excluded psychiatric testimony offered to show the defendant did not have the ability to form certain mental states as a result of the medically recognized mental disorders of anxiety and depression. The trial court also excluded expert testimony offered to prove greater impairment caused by the combined effect of alcohol, lack of sleep, and mental disorders.[48] In an offer of proof, a psychiatrist testified that given the defendant's background, his mental disorders, the difficulties with his supervisor, and the other circumstances surrounding the shooting, the defendant was "likely to be severely impaired in his ability to form the intent to kill or to injure." The psychiatrist described the defendant's circumstances as an "explosive scenario" and also testified that the alcohol and lack of sleep would tend to further dilute ego control.[49]
Petitioner Ellis argues that in his case, defense experts similarly explained that, as a *849 result of his mental disorders, he suffered from a "significant loss of (already severely attenuated) ego-control"[50] at the time of the killings. Petitioner challenges the State's argument that the expert testimony only proves an "irresistible impulse,"[51] a defense not accepted in this State. Petitioner asserts that in Edmon, the court determined that ego-control, an entirely different matter from irresistible impulse, refers to the perceptive powers, and not to the volitive powers. Petitioner contends that under Edmon, mere reference to an "explosive scenario" does not convert expert testimony into testimony on irresistible impulse.[52] The Court of Appeals stated in that case that "substantial reduction" of the probability that the defendant formed the challenged mental state is the required showing, not absolute certainty and "the jury then gives the opinion whatever weight it deserves."[53]
Petitioner claims this case is an even stronger one to support diminished capacity than Edmon[54] because he presented two experts who testified he suffered from two long-standing mental disorders, the State's expert agreed he suffered from a personality disorder,[55] he has been precluded from presenting a diminished capacity defense, and murder in the first degree requires premeditation, which necessitates a greater mental capacity than intent.
Relying on State v. Eakins,[56] Petitioner claims the facts in this case are more compelling than in other cases in which this Court allowed expert testimony on diminished capacity. In Eakins, the defendant was convicted of two counts of second degree assault while armed with a deadly weapon. This Court affirmed reversal by the Court of Appeals. The defendant went to a restaurant where his estranged girlfriend worked and pointed a loaded revolver at her and the kitchen manager. Admitting he had pointed the gun, defendant claimed diminished capacity induced by drugs and alcohol. His therapist testified the defendant was depressed and suffered from a personality disorder for which he was taking prescription tranquilizers with alcohol. The therapist said he believed the defendant had consumed as much as 24 ounces of alcohol on the night of the assaults. A psychiatrist testified the defendant was incapable of forming the intent to assault because of his depression and the consumption of alcohol with his medication. He described the defendant's behavior during the assaults as a "delirium induced by drugs and alcohol." The two victims and two other witnesses testified the defendant appeared angry but not intoxicated or delirious the night of the assaults. Two police officers who interviewed the defendant four hours after the assaults testified he did not appear intoxicated and spoke clearly and coherently.
Petitioner argues the cases of Edmon and Eakins lead to the conclusion that the trial court erred in excluding his expert testimony on diminished capacity.
The State to the contrary asserts the trial court properly exercised its discretion to exclude expert testimony on diminished capacity because Petitioner has not satisfied the nine foundational requirements of Edmon. The State contends that Washington courts *850 have consistently applied the "Edmon factors" in determining admissibility of expert testimony on diminished capacity.
Citing State v. Griffin, the State argues that a diminished capacity defense requires substantial evidence of a mental condition and requires that the evidence "logically and reasonably connects the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged."[57]
In Griffin, the defendant was convicted by a jury on three counts of forgery. Upon returning from service in Vietnam, he had been hospitalized for psychiatric treatment five times. A clinical psychologist and a psychoanalyst testified the defendant suffered from a catatonic paranoid schizophrenia and chronic alcoholism and therefore would be incapable of forming an intent to injure or defraud. The trial court refused an instruction on diminished capacity. The Court reversed the conviction, concluding that "[s]uch expert opinion on diminished capacity is admissible when relevant to the issue of defendant's mental intent." The Court determined there was "abundant evidence in the record to show defendant's mental disorders impeded his ability to formulate the requisite intent" and denial of an instruction on diminished capacity was reversible error.
The State asserts that in State v. Davis[58] the court applied the "Edmon factors" in excluding expert testimony on diminished capacity. In that case, the defendant was convicted of second-degree felony murder and second-degree assault. Citing Edmon, the Court of Appeals upheld the trial court's decision to exclude expert testimony.
The State asserts that in State v. Thamert[59] the court applied the "Edmon factors" in affirming the trial court's decision to exclude expert testimony on diminished capacity. In that case, the defendant, who was convicted of two counts of second-degree robbery, confessed to the crimes, explaining that "voices told him to rob the banks." A psychiatrist testified the defendant suffered from chronic paranoid schizophrenia, an incurable disorder characterized by identity confusion, hearing voices, indecisive thinking, and poor impulse control and was therefore unable to form the intent to steal at the time of the robbery. The court excluded the testimony of another psychiatrist, determining the offer of proof regarding that expert did not comply with three of the nine "Edmon factors" and that the testimony would be cumulative.
The State argues this case is distinguishable from Edmon, contending that defendant Edmon was diagnosed with the medically well-established mental disorders of anxiety and depression. The State claims that, in contrast, Petitioner Ellis has been diagnosed only with nonspecific mental disorders[60] and the experts' diagnoses were inconsistent.
The State refers to the testimony of Dr. Whitehill on June 16, 1997, in which he stated[61] that Petitioner suffered from borderline personality disorder,[62] although he was not *851 in a dissociative[63] state at the time of the killings. At a later point in his testimony, he described Petitioner's mental disorders as borderline personality not otherwise specified[64] and intermittent explosive disorder[65] or the parallel condition of impulse control disorder.[66] In his summary of findings dated January 3, 1997, Dr. Whitehill concluded that Petitioner suffered from a severe personality disorder[67] and impulse control disorder or intermittent explosive disorder.[68]
In testimony on June 16, 1997, Dr. Cripe stated that Petitioner suffered from impulse control disorders.[69] In his neuropsychological evaluation report dated August 7, 1996, he determined that the homicides were a "result of very complicated and powerful psychological and interpersonal factors which developed over many years, but were suddenly impulsively unleashed while in an intoxicated state." He explained that Petitioner was "instantly flooded with angry emotion, a cauldron of stored up aggression was released, and he lost control."[70] In an addendum to his report dated January 2, 1997, Dr. Cripe stated that, after reviewing his evaluation and considering Edmon and other cases, he concluded that Petitioner suffered from a "severe antisocial personality disorder with episodic dyscontrol which is the result of complex biosocial-psychological causes."[71] But in that same report he also concluded *852 that Petitioner suffers from "a mental illness related to a long history of child and adolescent abuse which combined with drug abuse and the circumstances of the homicides resulted in a diminished capacity to normally control his mind and behavior".[72] In a declaration dated July 28, 1997, Dr. Cripe stated that "Mr. Ellis suffers from a severe personality disorder. There are mixed features to this personality disorder, but one of the features is antisocial. Additionally, he has an impulse control disorder. These disorders are the result of complex biological, social, and psychological factors."[73]
The State contends Dr. Whitehill's testimony was not based upon substantial supporting evidence in the record and he did not state an opinion with reasonable medical certainty as required under "Edmon factors" three and four.[74]
The State asserts that because the defense experts relied upon Petitioner's "self-serving statements," their opinions were grounded in speculation.[75] Referring to Dr. Cripe's testimony, the State claims he disregarded the fact that Petitioner contradicted himself in statements about using drugs and alcohol before the killings.[76] The State argues that defense experts testified that Petitioner's actions resulted from extreme "explosive rage" and "emotional flooding," which describes an irresistible impulse, a defense not available in this State. The State concludes that consequently Petitioner has not satisfied "Edmon factor" five, which requires that the cause of the inability to form a specific intent must be a mental disorder, and not emotions like jealousy, fear, anger, and hatred.[77]
According to the State, Petitioner has not satisfied "Edmon factors" six, seven, eight, and nine because defense experts did not explain how Petitioner's mental disorders caused an inability to form intent. The State claims the expert testimony was conclusory only and did not logically and reasonably connect Petitioner's alleged mental condition with the asserted inability to form the required specific intent to commit the crime charged. The State argues that, after being given another opportunity on the motion for reconsideration, Dr. Cripe could not reasonably and logically connect Petitioner's mental disorders with lack of intent.[78]
The State contends this Court affirmed the trial court's refusal to instruct the jury on diminished capacity on similar grounds in State v. Ferrick.[79] In that case, the defendant, who was convicted of first degree murder, had been committed to and discharged from Western State Hospital three times. Shortly after her last discharge, the defendant stopped taking her prescribed medication and brutally stabbed her mother to death upon learning her mother had talked about having her recommitted. The Court concluded there was "no substantial evidence to establish that [defendant's] alleged mental condition diminished or destroyed her capacity to form the specific intent to kill her mother."[80]
The State asserts that defense experts in this case similarly did not provide the necessary nexus. The State noted that its expert, Dr. Gagliardi, testified that ideally the causal nexus between the disability and lack of intent *853 requires either a scientific or very good clinical explanation and the disability has to relate to a relatively well-defined and very serious mental disorder and not a minor mental disorder or personality disorder.[81]
The State concludes that the trial court properly exercised its discretion in excluding Petitioner's expert testimony on diminished capacity because Petitioner did not satisfy the nine foundational requirements of Edmon. The State asserts that the court's decision to exclude evidence may be "reversed only upon a manifest abuse of discretion" and "sustained on any proper basis within the record and will not be reversed simply because the trial court gave a wrong or insufficient reason for its determination."[82] The State gratuitously emphasizes that the court's ruling would not preclude Petitioner from presenting diminished capacity testimony as mitigation evidence in the sentencing phase[83] of the trial, in the event the case proceeds to that stage.
Petitioner argues that the expert testimony in this case has satisfied the foundational requirements of Edmon and that it is also admissible under Evidence Rule (ER) 702.[84] According to Petitioner, in recent cases since Edmon this Court has held that ER 702 governs admissibility of expert testimony which does not involve new or novel scientific evidence. He asserts that diminished capacity is a well-recognized defense and does not involve new or novel scientific principles and therefore courts should allow expert testimony on diminished capacity when the requirements of ER 702 have been satisfied. Petitioner contends the qualifications of the defense experts were unchallenged and their testimony would be helpful to the trier of fact because mental disorders are beyond the ordinary understanding of lay persons. The State to the contrary asserts that because Petitioner did not argue ER 702 admissibility before the trial court, he is precluded from presenting that argument on appeal. This is not necessarily so. We accept Petitioner's argument under the circumstances of this case.[85]
The State argues that expert testimony on diminished capacity would not be admissible under ER 702, which is at most a general rule for admissibility of expert testimony. The State asserts that if this Court allows expert testimony on diminished capacity under ER 702, it would be overruling Edmon which requires a defendant to satisfy nine foundational requirements before presenting to the trier of fact expert testimony on diminished capacity.
Petitioner argues that the trial court's ruling excluding his expert testimony, which precludes him from establishing diminished capacity in the guilt phase of his trial, deprives him of his constitutional right to present his own defense. He contends the United States Supreme Court has held that under the Fifth, Sixth, and Fourteenth amendments, criminal defendants have a constitutional right to testify in their own defense. Petitioner cites Rock v. Arkansas[86] in which the Court stated that, although the right to present relevant testimony is not without limitation, "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify."
*854 Petitioner argues that, as a criminal defendant in a capital case, his constitutional right to present a defense outweighs any interest served by excluding his expert testimony. Petitioner suggests the State seems fearful that the jury might be influenced by the expert testimony and possibly acquit on the basis of irresistible impulse or mere emotion instead of diminished capacity. Petitioner asserts that actually a jury is not bound by the opinion of an expert and will properly evaluate the credibility of the testimony under proper instructions from the court such as Washington Pattern Instruction (WPIC) 6.51.[87]
The State asserts the United States Supreme Court stated in Montana v. Egelhoff that "the proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible.... The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." In that case, the Court rejected a due process challenge to a state statute which precluded defendants from claiming diminished capacity occasioned by voluntary intoxication. The Court ruled it is "`within the power of the State to regulate procedures under which its laws are carried out,' ... and its decision in this regard is not subject to proscription under the Due Process Clause unless `it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"[88] The State contends Petitioner has not shown that his "right to present a diminished capacity defense" is a fundamental principle of justice and therefore neither Washington law on diminished capacity nor the ruling of the trial court is unconstitutional.
In reversing the trial court on allowing expert testimony on diminished capacity, the Court of Appeals in Edmon explained that "[t]he psychiatrist properly testified to a mental condition, i.e., reduced perception, that, in his opinion, was part of the mechanism flowing from the mental disorder and impairing Edmon's ability to form the intent to kill or injure. An opinion unsupported by this explanation would have been inadmissible."[89]
In this case defense expert Dr. Whitehill testified that Petitioner suffered from a borderline personality disorder and intermittent explosive disorder. He explained these disorders underlay Petitioner's killing of his mother because he misperceived her remarks about his girlfriend and interpreted them as "extremely deflammatory [sic], as denying him his self. There would be some diminished ego function there, and then the capper, of course, is the reaction to the interpretation. This is what I have termed emotional discontrol.... So we have an individual whose perceptional process, whose interpreting process, his decision making capacity and his ability to properly regulate his behavior, was severely compromised as a direct result of this ongoing personality disturbance." Dr. Whitehill testified that in Petitioner's "continuously disregulated state" he killed his sister because he believed "that this was a child who symbolized all of what he did not receive with respect to maternal attachment, all of what Jamie, his young sister received.... [s]he awakened as a stimulus, someone which reminded him, which triggered another intense exacerbation of an already existing level of emotional discontrol."
Defense expert Dr. Cripe testified that Petitioner suffered from an antisocial personality disorder and impulse control disorder. When asked by defense counsel how the *855 mental disorder causally connected to lack of intent, Dr. Cripe responded that "when he went over there in that situation with his mother, he walked in there with this history of problems, this history of mental disorder.... He is in a situation where certain stressors arise. And given the weaknesses in his psychological makeup, the mind is overpowered basically bythere is a breakdown in the deliberation process, in forming judgments and decisions, and the person ends up acting from disarray and from confusion and emotional forces, rather than from a deliberate forming of intent...." Dr. Cripe stated that he believed Petitioner did not act with intent partly because "it's not very common that human beings kill their mothers and little sisters. This is an extraordinary thing.... I mean people who plan and deliberately kill people, like hit men, don't do it with breadboards."
The trial court in this case intelligently evaluated the testimony and reports of defense expert witnesses. The court, however, placed too much reliance upon foundational criteria announced in State v. Edmon, a 1981 Court of Appeals case. We do not consider Edmon controlling in this case. Strict application of Edmon results in at least a questionable result in this capitol case by depriving Petitioner Ellis, before trial, of an opportunity to present a diminished capacity defense. The question of admissibility of the testimony of defense experts is better determined under ER 702, 401 and 402.[90] If at trial the court allows any such testimony, its weight and value would then be determined by the trier of fact, the jury, under proper instructions, including an instruction such as WPIC 6.51.

SUMMARY AND CONCLUSION
To maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the specific intent to commit the crime charged.
Considering the defense expert testimony in its entirety, the trial court correctly determined the foundational requirements for admitting expert testimony on diminished capacity as announced in the 1981 Court of Appeals case of State v. Edmon[91] had not been satisfied. But we do not consider that case controlling in our decision in this case.
For some reason, not quite evident, the 1981 Court of Appeals decision, State v. Edmon, has been elevated to the status of the last, absolute and definitive word on foundational requirements for presentation or admissibility of expert testimony on diminished capacity. In fact the nine foundational requirements the opinion states must be satisfied before "[a]n expert may give an opinion regarding a defendant's ability to form a specific intent" have been referred to as "Edmon factors." Petitioner Ellis and Respondent State both address their primary attention to whether the nine "Edmon factors" have been satisfied. The trial court made her decision by strict application of the "Edmon factors."
We do not adopt the foundational requirements announced in Edmon as absolute. Even assuming their applicability in this case, it was error for the trial court to exclude the proffered defense expert testimony *856 on diminished capacity prior to trial on a motion in limine in this case which is an aggravated first degree murder case in which the State intends to ask for the death penalty. There is sufficient basis in the record at this stage to allow expert testimony on diminished capacity at trial during the guilt phase.
The defense expert witnessesall qualified to give opinionswill testify that Petitioner Ellis experienced diminished capacity at the time he committed the offenses charged. Their testimony should be allowed at trial under ER 702. They would be subject to cross-examination as they were as "hostile witnesses" in the pre-trial proceeding on the motion in limine. The trier of factthe jurycan then determine what weight, if any, it will give to their testimony. This is fundamentally fair and consistent with due process.
Evidence Rule 702 states the general rule for admissibility of expert testimony, although it does not refer specifically to expert opinion on diminished capacity. The decision of the trial court to exclude expert testimony on diminished capacity prior to trial upon the record before us deprives Petitioner Ellis of his constitutional right to present evidence in his defense, notwithstanding the trial court's understandable interpretation of State v. Edmon.
"Admissibility of evidence lies within the sound discretion of the trial court and the court's decision will not be reversed absent abuse of that discretion."[92] "An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court."[93] Under the circumstances of this case, a pre-trial proceeding in a capital case, the abuse of discretion rule must be applied in order to achieve a fundamentally fair result. In excluding the expert testimony on diminished capacity in the State's motion in limine, the court unreasonably and prematurely concluded the foundation for admissibility had not been satisfied. The court should have considered admissibility under ER 702 and application of ER 401 and 402.
We reverse the Superior Court and allow Petitioner Joey C. Ellis to proceed with presentation of expert testimony in the guilt phase of his case to establish his diminished capacity defense subject to admissibility under Evidence Rule 702 and subject to appropriate instructions to the jury.
DOLLIVER, JOHNSON, MADSEN and SANDERS, JJ., concur.
ALEXANDER, Justice, concurring.
I concur in the result reached by the majority. I write separately only to express my disagreement with what I perceive is the majority's conclusion that it is error for a trial court to exclude proffered defense expert testimony on diminished capacity "prior to trial on a motion in limine in this case which is an aggravated first degree murder case in which the State intends to ask for the death penalty." Majority op. at 856. In my judgment, a trial court may, when appropriate, grant a motion to limit evidence in a capital case. Although the granting or denial of such a motion is always within the discretion of the trial court, subject only to a review for abuse, I fully subscribe to the notion that such a motion may be granted if (1) it describes the evidence objected to with sufficient specificity to enable the trial court to determine that it is clearly inadmissible, and (2) the evidence is so prejudicial that the movant should be spared the necessity of calling attention to it by objecting when offered. Douglas v. Freeman, 117 Wash.2d 242, 255, 814 P.2d 1160 (1991). I fail to see any reason why that rule should not pertain in capital cases.
Notwithstanding this minor disagreement with the majority, I entirely agree with it that the trial court erred here in granting the State's motion in limine. In my view, the State did not establish that the evidence proffered by the defendant on the issue of diminished capacity was clearly inadmissible when it is considered in light of ER 401, 402, and 403.
GUY, J., concurs.
*857 DURHAM, Chief Justice, dissenting.
I agree with part A of Justice Talmadge's dissent. The trial court did not abuse its discretion in excluding the expert testimony in this case. Admissibility of such evidence should be determined under the rules of evidence and the principles of testimonial capacity for expert witnesses. However, I do not agree with part B of the dissent. Abolishing the diminished capacity defense is not appropriate at this time.
TALMADGE, Justice, dissenting.
The majority applies the principles of ER 402, 702, and 703 to the admissibility of expert testimony on a defendant's diminished capacity. I agree with the majority these evidentiary principles for the general admission of expert testimony are appropriate. But the majority does not analyze the admissibility of the experts' testimony here against time-honored principles of testimonial capacity for expert witnesses.
In addition, the majority also determines the test for diminished capacity set forth in State v. Edmon, 28 Wash.App. 98, 621 P.2d 1310 (1981), is no longer applicable. It would appear any type of expert testimony that negates a specific intent must be admitted under the majority's analysis. This goes too far.
Under the circumstances of this case, the trial court carefully assessed the question of whether Ellis demonstrated a causal connection between his alleged mental disorders and the requisite ability to form the criminal intent. Consequently, the trial court did not abuse its discretion in excluding the defense expert testimony.
The language of psychology and the law is often incongruous. As a result, much confusion has arisen not only in Washington courts, but in courts around the country, regarding what has been termed the diminished capacity defense. Rather than illuminate this confusion the majority decision exacerbates it by eliminating the Edmon guidelines our courts have employed for more than 15 years to evaluate the admissibility of psychological evidence, without offering new guidance. Because I believe it unwise for us to embark on uncharted seas in this difficult area of the law, and because the trial court correctly decided the proffered testimony of two psychologists in this case was not relevant to any issue to be determined at trial, I dissent.

ANALYSIS
A. The Trial Court did not Err in Excluding the Experts' Opinions
The facts of this case are egregious. Ellis and his mother were drinking and smoking marijuana and, allegedly because of the mother's statement regarding Ellis's girlfriend, his personality disorders were engaged to such a degree that he beat her to death with a breadboard and then proceeded to beat his baby sister to death with the breadboard as well. The trial court, however, properly concluded the experts simply did not demonstrate that Ellis's "disorders" rendered him incapable of intending the crime of which he was convicted.
Ellis is charged with aggravated murder in the first degree. To be guilty of this crime, a person must have caused the death of another with "a premeditated intent" to cause that death.[1] RCW 9A.32.030(1)(a). Thus, not just intent, but "premeditated intent" is one of the elements of the crime the State must prove beyond a reasonable doubt in order for Ellis to be found guilty of the crime with which he is charged. State v. Crediford, 130 Wash.2d 747, 759, 927 P.2d 1129 (1996) (citing In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)). As we said in State v. Lane, 112 Wash.2d 464, 472-73, 771 P.2d 1150 (1989):
Premeditation is an element separate and distinct from the specific intent to kill required for first degree murder; it also *858 distinguishes first degree murder from second degree murder. The failure of the State to sufficiently establish premeditation has been held to require reversal of a conviction for aggravated first degree murder. Clearly, therefore, premeditation constitutes an essential element of the crime of aggravated first degree murder.
(Footnotes omitted.)
WPIC 26.01.01 defines premeditation as follows:[2]
Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.
We first approved this formulation in State v. Rice, 110 Wash.2d 577, 604, 757 P.2d 889 (1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 707 (1989), and more recently affirmed it in State v. Benn, 120 Wash.2d 631, 658 n. 4, 845 P.2d 289, cert. denied, 510 U.S. 944, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993). The key considerations for the jury's ultimate determination are (1) did Ellis form the intent to take human life, and (2) did he deliberately form a design to kill over some period of time longer than a moment.
1. The Experts Lacked Testimonial Knowledge
The right to present witnesses in one's own defense is a fundamental element of due process of law. State v. Maupin, 128 Wash.2d 918, 924, 913 P.2d 808 (1996). It follows that one must be allowed to present witnesses to rebut or negate the State's presentation of proof as to an element of the crime with which one is charged. Thus, if the State in this case, presents, as it must, some evidence to the jury to suggest premeditation by Ellis, he must have the right to present evidence to the contrary. To deny him this right would be to deny him a fundamental element of due process of law.
But the right to present evidence in one's own defense is not utterly unfettered. That evidence must be relevant. There is no constitutional right to introduce irrelevant evidence. Maupin, 128 Wash.2d at 925, 913 P.2d 808; State v. Hudlow, 99 Wash.2d 1, 15, 659 P.2d 514 (1983). Accord United States v. Becker, 444 F.2d 510, 511 (4th Cir.1971); People v. Grisset, 288 Ill.App.3d 620, 681 N.E.2d 1010, 1019, 224 Ill.Dec. 389, appeal denied, 174 Ill.2d 576, 686 N.E.2d 1167, 227 Ill.Dec. 11 (1997); O'Rourke v. State, 166 Neb. 866, 90 N.W.2d 820, 823 (1958); State v. Cardenas-Hernandez, 219 Wis.2d 516, 579 N.W.2d 678, 687 (1998). At issue in this case is the relevance of the testimony of two psychologists to the jury's task.
Both Dr. Whitehill and Dr. Cripe opined Ellis was not able to premeditate the murder of his mother and half-sister. Even though the question of premeditation is the ultimate and central fact for the jury to decide, Ellis argues persuasively he should be allowed to introduce this testimony at his trial as rebuttal to negate the premeditation element of the crime of which he is accused. Beginning in 1940, however, in a steady line of cases we have never questioned or overruled, we have held such testimony to be inadmissible because the experts lacked testimonial knowledge.
In State v. Davis, 6 Wash.2d 696, 108 P.2d 641 (1940), the defendant in a first degree murder case attempted to introduce the written report of an "expert alienist"[3] who had examined the defendant in jail and had concluded the defendant had not premeditated the murder. The trial court disallowed the evidence, and we affirmed because "[t]he witness, of course, had no personal knowledge concerning the facts of the case, and his opinion on the question of premeditation or the lack of premeditation was inadmissible." *859 Id. at 707, 108 P.2d 641. Dr. Whitehill and Dr. Cripe likewise have no personal knowledge of the facts of the murders; they know only what Ellis told them and what is in the police reports.
In State v. Farley, 48 Wash.2d 11, 290 P.2d 987 (1955), cert. denied, 352 U.S. 858, 77 S.Ct. 79, 1 L.Ed.2d 65 (1956), we explained the reasons for the personal knowledge requirement where the defendant attempted to present the testimony of a doctor regarding the defendant's state of mind during a homicide:
The question involved in the concluding assignment of error was:
"Doctor, would you state whether or not you formed an opinion as to whether or not the specific reaction at the time of the killing was or was not an outbreak of rage and destructive hostility under severe stress?" (Italics ours.)
It appears from the record that the doctor, whose qualifications are admitted, had examined appellant on three occasions while he was in custody, and had seen the reports of two other doctors' examinations of appellant.
The purpose of the question here involved was not to elicit a diagnosis of appellant's mental condition as revealed by the examinations. Counsel was trying to rebut the inference of premeditation and intent, which could be drawn from the circumstances of the killing, by having the doctor testify as to a fact with regard to specific mental reaction of appellant at the time he committed the crime. Since the doctor was not present at the murder, he had no testimonial knowledge of appellant's appearance, statements, acts, and demeanor, or the circumstances surrounding the crime. His diagnosis of appellant's state of mental health, as revealed by subsequent examinations, cannot be related to the particular instant of the crime. Nevertheless, counsel contend that, if a layman can express an opinion as to the mental condition of a defendant at the time of committing a crime, there is even more reason for permitting a doctor to do so. This contention misconceives the Washington rule. In State v. Gaul, 88 Wash. 295, 152 P. 1029[, 1032,] with regard to a layman's testimony, we said:
"The intent with which an act is done is a mental process, and as such generally remains hidden within the mind where it is conceived, and is rarely, if ever, susceptible of proof by direct evidence, but may be inferred or gathered from the outward manifestations, by the words or acts of the person entertaining it, and the facts or circumstances surrounding or attendant upon the offense with which he is charged."
Accordingly, a layman who sees the commission of a crime can describe the acts, the appearance, and demeanor of a defendant, from which inferences as to a defendant's mental processes may be drawn, but a doctor who was not present at a crime has no testimonial knowledge of the circumstances needed to support such inferences.
Id. at 20-21, 290 P.2d 987 (emphasis omitted). Accord State v. Craig, 82 Wash.2d 777, 779-80, 514 P.2d 151 (1973) ("doctor who was not a witness to the crime and does not have firsthand knowledge of the defendant's state of mind at the time, may not give his opinion as to what that mental state was"); State v. Moore, 61 Wash.2d 165, 172-73, 377 P.2d 456 (1963) (psychiatrist's opinion that defendant was incapable of forming intent not sufficient to require a manslaughter instruction); State v. Cogswell, 54 Wash.2d 240, 248, 339 P.2d 465 (1959) (testimonial knowledge of demeanor of defendant at proximate time of offense required for admission of testimony as to defendant's capacity to form specific intent); State v. Upton, 16 Wash.App. 195, 201, 556 P.2d 239 (1976) (doctor's opinion regarding defendant's mental state at the time of the shooting, absent testimonial knowledge, properly excluded), review denied, 88 Wash.2d 1007 (1977); State v. Fullen, 7 Wash.App. 369, 382-83, 499 P.2d 893, review denied, 81 Wash.2d 1006 (1972), cert. denied, 411 U.S. 985, 93 S.Ct. 2282, 36 L.Ed.2d 962 (1973).[4] Even hypothetical questions to a *860 doctor as to a defendant's state of mind at the time of an offense are barred under this rule. State v. Tyler, 77 Wash.2d 726, 759, 466 P.2d 120 (1970) (answers to hypothetical questions are "no more than conjecture and speculation"), vacated in part by 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756 (1972). This line of cases remains the law.[5]
As a rule of evidence, the testimonial knowledge requirement makes eminent good sense. It mirrors the common law rule that laypersons may opine on the mental responsibility of others providing they personally observed the facts to which they are testifying. Carr v. Deking, 52 Wash.App. 880, 886, 765 P.2d 40 (1988), review denied, 112 Wash.2d 1019 (1989).
Dr. Whitehill and Dr. Cripe do not have testimonial knowledge of the murders. For all they or anybody else knows, Ellis awakened the morning of the murders with the intent to murder his mother and sister that night. For all they or anybody else knows, Ellis attacked them with the breadboard without any provocation whatsoever, in furtherance of the murderous design he formed early that morning. The psychologists' testimony as to Ellis's state of mind at the time of the murders would be no more than conjecture and speculation.[6] Under case law that has been on the books for nearly 50 years, the trial court properly excluded it.
Although on its face the proffered testimony seems precisely apropos to the question of premeditation, what is missing from this case and from the trial court's analysis is the precise legal definition of premeditation. The psychologists spoke about premeditation in terms that evidently had some meaning to them from a diagnostic viewpoint, but no one asked them to apply their diagnoses to the meaning of premeditation under Washington law set forth above.
*861 These legal questions of premeditation are vastly different from the aspects of Ellis's behavior the psychologists testified about. The psychologists gave reasons stemming from psychodynamic factors to establish why Ellis did what he did, not whether he formed the intent to kill. They said he could not have premeditated because, according to what Ellis told them, he reacted on the spur of the moment, enraged by a derogatory remark his mother made about his girlfriend.
But acting impulsively does not negate premeditation. The question is: did Ellis form the intent to kill his mother and then act on that intent after some, albeit brief, deliberation? The experts did not speak to Ellis's intent, or the formation of a design to kill. They said only that he could not control his "ragefulness" because of his multiple personality disorders. These diagnostic conclusions do not answer the relevant legal question stemming from the legal definition of premeditation the jury will have to apply to the facts. That being the case, the trial court properly excluded the psychologists' proffered testimony as being irrelevant.
2. The Experts' Testimony was Inadmissible Under ER 702
Another reason for excluding the psychologists' testimony is the ER 702 requirement that testimony by an expert, to be admissible, must be helpful to the jury:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
ER 702 permits expert testimony only if it will assist the trier of fact. Testimony that is confusing, arcane, or otherwise unintelligible[7] will not assist the trier of fact. I cannot say the trial court abused its discretion in ruling such testimony inadmissible.
To the extent the testimony of Dr. Whitehill and Dr. Cripe did not address the question of premeditation from a legal point of view, but only from a psychological point of view, it could not possibly assist the jury in determining whether Ellis premeditated as a matter of law. An indication of the cross purposes between the testimony of the psychologists and the law occurred in the following colloquy:
Q. [The State] Dr. Cripe, how did Mr. Ellis's mental disorder prevent him from forming premeditation that night? In other words, how did he pick up the breadboard without being able to intend what happened? ...
A. What I am saying in the Ellis case here is, first of all, from everything that I can assess, I do not believe that this man went over there that night with the premeditated *862 idea of killing his mother and his half-sister. I do not believe that at all. I think he went over there distressed. He went over there with his mental condition and disorder.[[8]]
This emerged into a series of moments of distress and stress stimuli that, given this defect of mind, he became overwhelmed and disorganized psychologically. And these actions that occurred, the grabbing of the breadboard, the hitting of the mother and later the sister, were not the result of beforehand thinking and intending to do those things. These were sort of automatically[[9]] driven by this breakdown of mind. And that's where I am coming from.
Report of Proceedings (July 28, 1997) at 51-52. Dr. Cripe plainly believes Ellis can be found to have premeditated the murders only if he had planned them in advance of entering his mother's abode. While such a belief may comport with a lay understanding of premeditation, it has little to do with the legal definition of premeditation, especially as applied to the facts of this case.
It may be correct that Ellis did not plan to kill his mother before he called on her (although the experts report this only because that is what Ellis told them). That does not mean he did not premeditate her death, however. Premeditation can occur in a variety of circumstances where hardly any deliberation occurs. See State v. Gentry, 125 Wash.2d 570, 598-99, 888 P.2d 1105 (1995) (describing such cases). Because Dr. Cripe did not address premeditation as it is defined in Washington law, his testimony about premeditation is therefore irrelevant and would not assist the jury.
Dr. Whitehill's testimony illustrates the same point:
Q. [The State] Would you agree that the homicides in this case were impulsive in nature?
A. [Dr. Whitehill] Yes, in that they happened suddenly and were not planned, and were very rapid....
Q. Do you believe that [Ellis] has impulse control disorders; is that correct?
A. Yes, I do.
Q. All right. And the result of that is he has great difficulty, if not impossible, for him to control impulses under certain circumstances?
A. That's right.
Q. It's essentially very difficult for him to resist these impulses.
A. We certainly would say that clinically, whether or not it fits exactly your definition of that I am not real certain of, but we are talking about someone who under certain situations will act very rapidly without thought, and very extremely driven by abnormal levels of emotion, and with abnormal control mechanism, that is sort of what we are talking about here.
Report of Proceedings (June 16, 1997) at 70-72. Once again, the testimony focused on Ellis's inability to control himself, not on the central question of premeditation, i.e., whether he intended to take a human life and whether he deliberately formed a design to kill over some period of time longer than a moment. That Ellis exploded with anger over the remark his mother made about his girlfriend, and this explosion was a manifestation of a mental defect, do not preclude the possibility that when the anger washed over him he did indeed deliberately form the design to kill his mother.
Dr. Whitehill wrote: "To believe that Mr. Ellis premeditated the deaths of his mother and sister is to believe, as per WPIC 26.01.01, that he thought these events over beforehand, which is to say, that he deliberated and formed the intent to take their lives." Clerk's Papers at 51. Here, Dr. Whitehill, like Dr. Cripe, seems to be relying on a lay definition of premeditation as a *863 planning process that takes place well before the commission of a crime. As noted above, however, that is not the definition Washington law applies to premeditation. A brief, but discrete, instant of deliberation suffices for premeditation.
Perhaps the best illustration of the incongruity between the meaning of premeditation in Washington law and the concept of premeditation as the psychologists have used it in this case is the following excerpt from Dr. Cripe's declaration:
In the Edmon case and in Mr. Ellis' case, the State and their expert Dr. Gagliardi appear to be promoting an unrealistic absolutistic view regarding diminished capacity. They would like us to believe that unless a person had "no capacity" to form an intent, then the requirement of the law is not met. Their interpretation in this matter seems extreme and ultra conservative. I am convinced that with their view only a person in a coma or dead would lack the ability to form the intent of an action.[[10]] With their interpretation of diminished capacity, they would have argued that Mr. Edmon did not have any problem with intent and the doctor's testimony regarding Mr. Edmon's mental condition should be withheld from the trier of fact. I am convinced that with such a conservative stance, if Dr. Gagliardi had seen Mr. Edmon, he would have concluded that there was no basis for diminished capacity. After all, Edmon carried out "purposeful goal-directed" behaviors. He got up and went to work. He deliberately put a loaded gun on his person. He was able to direct specific punches at his boss. He was able to pull a gun out and pull the trigger while aiming at the target (the boss). All of these actions appear as goal directed and purposeful to an onlooker. Edmon was not psychotic. He knew where he was and what he was doing. He was "just" depressed and stressed. This kind of thinking only focuses upon the acts and does not consider the mental condition or state of the person before and during the actions.
In reality, although Edmon engaged in actions that appeared goal directed, the behavior all occurred in the context of a mental disorder (although not of psychotic proportions) and alcohol effects which were adversely affecting his perception, reasoning, emotion, judgment, decisions, and that ultimately resulted in his actions. His capacity to control and regulate he actions in a manner normally expected of a rational person with normal mind was adversely affected and eroded by his mental problems. This mental state diminished his capacity to rationally understand the situation, logically plan, make normal judgments and control emotion. In sum, because of his mental condition, he had a diminished ability to form a specific intent.
Clerk's Papers 60-61. Earnestly, eloquently, and in evident good faith, Dr. Cripe has here set forth precisely why his testimony is not relevant to the ultimate determination of Ellis's guilt for the premeditated murders of his mother and half-sister. As is evident, the final sentence is a non sequitur: Dr. Cripe fails utterly to say how Edmon's diminished ability "to rationally understand the situation, logically plan, make normal judgments and control emotion" related to his capacity to intend to kill his boss. Edmon certainly exercised poor judgment because of the various psychological and emotional factors besetting him, but he also certainly intended to do what he did, i.e., kill his boss.
Likewise, Dr. Cripe sets forth his psychological diagnoses as the reasons why Ellis killed, then attempts to leap across a vast logical chasm to equate these reasons with Ellis's purported inability to premeditate the deaths. He gives no reasons why the diagnosed disorders prevented Ellis from premeditating. If anything, the circumstances Dr. Cripe considered support premeditation, rather than negate it. Surely when Ellis's mother made the remark that angered Ellis, the thought went through his mind, however explosively or uncontrollably, "That is the last straw. I will kill her." He surely then formed the design to move to the breadboard, take it from its place, move back to *864 his mother, and strike her with it, not once but several times. If he had not intended to kill his mother, she might still be alive. That his psychologists believe Ellis could not control his urge to kill his mother is not the same thing as saying he did not intend to do it. The psychologists offered no evidence that Ellis's volitional difficulties negated his mental state; they simply asserted as much conclusorily. Their testimony fails the relevance test because it simply does not addressin legal termsthe question of whether Ellis premeditated the deaths.
Dr. Cripe evidently believes Ellis is less morally responsible for the murders than some paradigmatic killer not beset with the same array of disorders who kills because he is evil. But a cold-blooded killer, say, for instance, someone who kills solely for money, might be diagnosed as having a severe Antisocial Personality Disorder. These are people we used to refer to as psychopaths or sociopaths. AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS [DSM-IV] 645 (4th ed.1994). Such people have a pervasive pattern of disregard for and violation of the rights of others, as evidenced by repeated acts that subject them to arrest, deceitfulness, impulsivity, irritability and aggressiveness, reckless disregard for the safety of others, consistent irresponsibility, and "lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another." DSM-IV at 649-50. Perhaps Dr. Cripe would diagnose such a person as having severe Antisocial Personality Disorder, and conclude he could not have formed the specific intent to commit murder because he could not feel remorse and was deceitful and impulsive. Again, this last sentence is a non sequitur. The legal question is, did the accused premeditate, not did his personality disorders keep him from feeling remorse.
Dr. Cripe's reports give further evidence his conclusions are based solely on his psychological diagnoses and his belief that Ellis's mental condition should be considered in mitigation of his punishment, as opposed to bearing on the legal ramifications as they relate to Ellis's guilt:
The homicides were impulsive. There is no evidence that Mr. Ellis planned all of this.[[11]] While he and his mother were under the influence of drugs and alcohol, he was significantly stressed by being put down by his estranged mother. He was instantly flooded with angry emotion, a cauldron of stored up aggression was released, and he lost control. He impulsively grabbed an unlikely weapon, a bread board, and bludgeoned his mother to death. The fact that he was putting on his shoes to leave, heard his sister stirring, and suddenly turned on her is another indication of an impulsive and unplanned act.[[12]] These homicides are the result of very complicated and powerful psychological and interpersonal factors which developed over many years, but were suddenly impulsively unleashed while in an intoxicated state. There are mitigating factors in this case....
There is no question that Mr. Ellis' problems are deep, long-standing, and resistant to change, and because of this he cannot be trusted to be loose in the community, but his extreme actions were the result of complicated forces and not an act of normal free will. The regrettable homicide behavior is the result of complicated interpersonal and psychological factors rather than a simple act of deliberate free will.[[13]] All involved, Mr. Ellis, his mother, and his sister are best seen as unfortunate victims *865 of a most regrettable dysfunctional situation. I urge all concerned to think about these matters carefully before making final judgments.
Clerk's Papers at 63. These thoughts belong to mitigation considerations, not considerations of guilt.
Finally, the majority opinion suggests any deficiencies in the psychologists' testimony would be subject to cross-examination and therefore curable. I would not so lightly eliminate the trial judge's function as arbiter of the rules of evidence. We surely would not permit someone to testify about Ellis's mental state without some certification of his or her credentials as an expert on mental health, even though cross-examination would expose the lack of credentials. Only relevant, competent, and not unduly prejudicial evidence is admissible. The trial court has a gatekeeping function under the rules of evidence. Sometimes admissibility questions are close. Nevertheless, we must not abdicate our gatekeeping role by receding from difficult decisions and letting the jury decide how much weight to give to evidence that is in fact irrelevant. The trial court must have the authority to exclude irrelevant evidence, as the trial court did here.
In summary, the trial court did not err in excluding the expert testimony. The testimony of Drs. Cripe and Whitehill neither would help the jury nor would be relevant to the central issue of premeditation in this case. At best, the testimony was conclusory and speculative. The trial court read the psychologists' reports, their declarations, and heard their testimony. We entrust the admissibility of expert testimony on diminished capacity to the discretion of the trial court, and overturn such decisions only upon a demonstration of abuse of discretion. State v. Hamlet, 133 Wash.2d 314, 324, 944 P.2d 1026 (1997). Such an abuse of discretion is present only when no reasonable person would take the view adopted by the trial court. State v. Castellanos, 132 Wash.2d 94, 97, 935 P.2d 1353 (1997). There was no abuse of discretion here.
B. Diminished Capacity Under Washington Law
Although I conclude the testimony of Ellis's two experts on diminished capacity was inadmissible and Ellis therefore failed to establish diminished capacity, as our cases have described it, I feel compelled to discuss the doctrine of diminished capacity under Washington law in light of the majority's resolve to abandon the Edmon guidelines.
The concept of diminished capacity was introduced into Washington law without discussion or debate in a five-page opinion in 1973. In State v. Ferrick, 81 Wash.2d 942, 944, 506 P.2d 860 (1973), we baldly stated, "The presence of a mental condition not amounting to criminal insanity is relevant to the elements or degrees of certain crimes involving specific intent." We cited as authority a New York case,[14] a New Jersey case,[15] a California case,[16] and an earlier case of our own, State v. White, 60 Wash.2d 551, 588, 374 P.2d 942 (1962), where we said as obiter dictum,
The presence of a mental disease or defect which falls short of criminal insanity may well be relevant to issues involving the elements or degrees of certain crimes, e.g., where malice, premeditation or intent are in issue.
In most recent diminished capacity cases, Washington courts have indicated such evidence may be admissible if an expert testifies a defendant suffers from a mental condition that impaired the defendant's ability to form the requisite specific intent of a crime. State v. Eakins, 127 Wash.2d 490, 502, 902 P.2d 1236 (1995). Historically, our courts have been reluctant to admit all expert opinion on diminished capacity. The Edmon court, for example, specifically held that expert opinion *866 that amounts to nothing more than testimony the defendant was emotional or had engaged in impulsive behavior would not constitute evidence of diminished capacity. Edmon, 28 Wash.App. at 105, 621 P.2d 1310. Moreover, we have held the evidence of the mental condition to which the expert is testifying must be "substantial" and the evidence must "logically and reasonably connect the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged." State v. Griffin, 100 Wash.2d 417, 419, 670 P.2d 265 (1983); State v. Ferrick, 81 Wash.2d 942, 506 P.2d 860 (1973); State v. Martin, 14 Wash. App. 74, 538 P.2d 873 (1975); State v. Carter, 5 Wash.App. 802, 490 P.2d 1346 (1971).
The peremptory announcement of the new diminished capacity rule in Ferrick is puzzling, given our earlier observation that "the legislature has established a policy in this state that only the most extreme degree of insanity will relieve a defendant of criminal liability. Any arguments for change in policy should, therefore, be addressed to the legislature." White, 60 Wash.2d at 589, 374 P.2d 942. We not only failed to defer to the traditional and quintessential legislative prerogative to prescribe the rules for crime and punishment when we adopted diminished capacity in Ferrick, we did so without judicial discussion or debate on the necessity for or desirability of the rule as a matter of public policy. Cf. State v. Wilcox, 70 Ohio St.2d 182, 436 N.E.2d 523, 525 (1982) ("The diminished capacity defense developed as a covert judicial response to perceived inequities in the criminal law."). No debate in our cases has appeared since, and Ferrick remains the law. See, e.g., State v. Warden, 133 Wash.2d 559, 563, 947 P.2d 708 (1997) ("Diminished capacity is a mental condition not amounting to insanity which prevents the defendant from possessing the requisite mental state necessary to commit the crime charged.").
In the meantime, however, California, which had pioneered the concept of diminished capacity, abolished the diminished capacity defense by statute in 1981, CAL.PENAL CODE § 28 (West 1988), and statutorily prohibits testimony by an expert as to a defendant's mental state required for the crime charged. CAL.PENAL CODE § 29 (West 1988).[17]See People v. Saille, 54 Cal.3d 1103, 820 P.2d 588, 2 Cal.Rptr.2d 364 (1991) (discussing history of diminished capacity defense in California and the origins of the legislation abolishing it). Other states in powerful and persuasive opinions have rejected diminished capacity as well. See, e.g., State v. Bouwman, 328 N.W.2d 703 (Minn. 1982) (psychiatric testimony inadmissible as to premeditation); State v. Wilcox, 70 Ohio St.2d 182, 436 N.E.2d 523 (1982); Stamper v. Commonwealth, 228 Va. 707, 324 S.E.2d 682, 688 (1985) (evidence of mental state at time of offense, in absence of an insanity defense, irrelevant).
One court criticized the diminished capacity defense in the following way: "[T]he more *867 brutal, bizarre, or sensational the crime, the greater is the likelihood of a successful diminished capacity defense.... In other words, the commission of the offense in most instances becomes ipso facto evidence of diminished capacity." State v. Wilcox, 70 Ohio St.2d 182, 436 N.E.2d 523, 532 (1982). That is precisely what the proffered testimony in this case indicates. In assessing Ellis's mental condition, Dr. Whitehill in part used the evidence of the murders to conclude Ellis was disturbed:
The level of violence in this crime is such as to bolster my contention that what we have is severe emotional discontrol as a manifestation of the borderline aspect of his personality disorder, not as a state of anger or rage; there certainly was rage, but not rage standing apart from mental disorder, rage as a component of an intense and impulsive reaction to his internal process, his borderline personality.
Report of Proceedings (June 16, 1997) at 42-43.[18] Dr. Whitehill reverse-engineered the psychology in this case to conclude that because Ellis committed violent homicides he suffers from "severe emotional discontrol." Dr. Cripe did the same thing:
It is very unusual that even persons with severe antisocial disorders kill their own parents, especially their mothers. Such extreme actions are often associated with an abnormal loss of control that is the result of a complicated mental/physical abuse history, chemical abuse/intoxication, and a stressful stimulus situation.
Clerk's Papers at 64.[19] In Dr. Cripe's view, one has to be afflicted with really serious problems to kill one's mother; therefore, Ellis must have serious enough problems to preclude his capacity to premeditate. In Fisher v. United States, 149 F.2d 28, 29 (D.C.Cir.1945), aff'd, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), overruled by United States v. Brawner, 471 F.2d 969 (D.C.Cir.1972), after the defendant introduced the testimony of a psychiatrist to the effect he was a "psychopathic personality of the predominantly aggressive type of behavior, and with an apathetic reaction to emotional situations," the defendant asked the trial court to issue an instruction allowing the jury to take into account the defendant's "entire personality" in considering the question of premeditation. The trial court refused to give the instruction and the Court of Appeals upheld the ruling, noting:
But it is obvious that brutal murders are not committed by normal people. To give an instruction like the above is to tell the jury that they are at liberty to acquit one who commits a brutal crime because he has the abnormal tendencies of persons capable of such crimes.
Fisher, 149 F.2d at 29. The proffered testimony of the psychologists in this case is subject to the same deficiency. The fatal deficiency, of course, is that while such testimony describes what impelled the defendant's criminal act, it says nothing about whether the defendant was able to premeditate his actions once his psychology impelled him to act.
An additional reason to question the diminished capacity defense is that unconscious mental states as causes of criminal behavior do not necessarily translate into compulsions to commit criminal behavior. "To be caused *868 to act by one's character, one's environment, or one's synaptic firing patterns is not to be compelled to act.... One must point to something other than causation to make out the excuse of compulsion." Michael S. Moore, Responsibility and the Unconscious, 53 S. CAL. L. REV. 1563, 1642, 1665 (1980). Dr. Whitehill made precisely this point when he testified: "It wasn't only that Mr. Ellis was in a rage, because people get in rages all the time without killing their mother, or two year old half sister." Report of Proceedings (June 16, 1997) at 31. The core question is, to what level of moral and legal culpability do the people of Washington hold Ellis for failing to restrain himself when he experienced rage. This question is not susceptible to being answered by science.[20] It is a question for a jury.
Ellis does not claim he did not know it was wrong to murder his mother and sister. He does not claim he committed the killings on orders from space aliens or disembodied spirits. He does not raise an insanity defense. He claims only that he is less culpable, i.e., can be guilty only of second degree murder rather than first degree murder, because his mental disorder prevented him from premeditating.[21] But society has not yet decided to hold one less responsible for an act simply because a psychologist may have discovered the cause of the act.
A third problem with diminished capacity not amounting to insanity is the universality of its application. If Ellis is less responsible for his actions because of his unconscious mental state, then everyone is always excused. The concept of moral responsibility vanishes. We are all slaves to our unconscious and are therefore not fully responsible for anything we might do that is criminal or otherwise socially unacceptable. "The strongest conceptual objection to the use of psychodynamic explanations to reduce responsibility is that these explanations lead to the conclusion that no one is responsible." Stephen J. Morse, Failed Explanations and Criminal Responsibility: Experts and the Unconscious, 68 VA. L. REV. 971, 1036 (1982). This reductio argument is both inescapable and contrary to hundreds of years of English and American criminal law:
Few persons have not suffered from such emotions or problems as depression, frustration, thought disorder and fury, and most persons have occasionally wished, often intensely, to harm others or to behave lawlessly. Moreover, all persons differ in their cognitive and control capacities. But a person who knows what he or she is doing and has sufficient control to be legally responsible at all should be fully accountable for his or her conduct. Our expectation in a civilized society is that all of us will control ourselves, obey the law, and not harm others because of our moods and furies, no matter how intense or sustained they may be.... It is not unjust to hold fully responsible those whose choices may be hard, but who are legally sane. If they know what they are doing and offend, they should be convicted and punished without reduction in the degree of offense or punishment.
Stephen J. Morse, Diminished Capacity: A Moral and Legal Conundrum, 2 INT'L J. LAW & PSYCHIATRY 271, 296-97 (1979).
Perhaps the clearest exposition of the problem with employing psychiatric testimony to assist the trier of fact in determining guilt (but not mitigation) is this:
Psychiatry and the law stand in essential contradiction or opposition. The legal view of behavior is in essence moralistic; an action is approved or disapproved, right or wrong, acceptable or unacceptable. A person is guilty or innocent as more or less clearly defined in advance by law. But psychiatry is a brand of medicine, and in *869 medicine nothing is wrong, only sick. A man can be no more guilty of crime than he is guilty of an abscess.
LIMITING THE INSANITY DEFENSE: HEARINGS BEFORE THE SENATE SUBCOMM. ON CRIMINAL LAW, 97th Cong., 2d Sess. 172 (1982). The most acute example of the essential dissonance in discourse between mental health professionals and the law appears in Dr. Cripe's bloodless description of the murders as "regrettable homicide behavior." Clerk's Papers at 63. This is Dr. Cripe appropriately speaking in his professional capacity as a diagnostician: what Ellis did was a "behavior," albeit regrettable because it involved homicides. Such testimony does nothing to inform the ultimate moral and legal judgment the jury must make.
Society may one day conclude there should be a diminished level of responsibility for criminal acts related to mental disorders not amounting to insanity. The Washington Legislature has yet to make such a decision, however. In fact, the Washington Legislature has indicated it may be rather disinclined to adopt psychological or psychiatric evaluations as justifications for diminished responsibility. Although the Legislature has never recognized diminished capacity with regard to culpability, it has provided circumstances under which a court may depart from sentencing guidelines in the Sentencing Reform Act of 1981. RCW 9.94A.390. Among the list of mitigating circumstances justifying a downward departure from the sentencing guidelines is the following: "The defendant's capacity to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law, was significantly impaired (voluntary use of drugs or alcohol is excluded)." RCW 9.94A.390(1)(e). This wording is nearly identical to the American Law Institute's Model Penal Code definition of insanity:
A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.
2 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 103, at 28 (15th ed.1994). Thus, one of the criteria for obtaining mitigation in sentencing in Washington amounts to proving insanity under the Model Penal Code.

CONCLUSION
The trial court did not abuse its discretion in excluding the testimony of Ellis's experts. Further, it is past time for us to reconsider the role of diminished capacity in Washington law. We should abolish diminished capacity as a doctrine for negating the presence of intent in a criminal case, except in those instances where objective measures of incapacity, such as for intoxication, are present. The Legislature created an insanity defense to criminal conduct in RCW 10.77. It has not seen fit to create a diminished capacity exception to culpability. Instead, the Legislature installed mental state as a mitigating factor in criminal sentencing. Until the Legislature specifically adopts diminished capacity as a defense to criminal culpability, we should not do so by judicial fiat.
NOTES
[1] "RCW 10.95.020 Definition. A person is guilty of aggravated first degree murder if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a), as now or hereafter amended, and one or more of the following aggravating circumstances exist:

". . . .
"(10) There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the person;
"(11) The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following crimes:
"(a) Robbery in the first or second degree;
"...."
"RCW 9A.32.030 Murder in the first degree.
(1) A person is guilty of murder in the first degree when:
"(a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person; or
"...."
[2] Clerk's Papers at 1-2.
[3] "RCW 9A.32.020 PremeditationLimitations.

(1) As used in this chapter, the premeditation required in order to support a conviction of the crime of murder in the first degree must involve more than a moment in point of time.
"...."
"RCW 9A.08.010 General requirement of culpability. (1) Kinds of Culpability Defined.
"(a) INTENT. A person acts with intent or intentionally when he acts with the objective or purpose to accomplish a result which constitutes a crime."
[4] Clerk's Papers at 1-2.
[5] Clerk's Papers at 11-12.
[6] Clerk's Papers at 5. See State v. Eakins, 127 Wash.2d 490, 502, 902 P.2d 1236 (1995) ("To show diminished capacity, a criminal defendant must produce expert testimony demonstrating the defendant suffered from a mental condition that impaired his or her ability to form the requisite specific intent.").
[7] Clerk's Papers at 11-13.
[8] Mem. from Pierce County Dep't of Assigned Counsel, Resp. to Mot. for Review, App. B.
[9] Resp. to Mot. for Review, App. C.
[10] Clerk's Papers at 44.
[11] Clerk's Papers at 43.
[12] Clerk's Papers at 17-30.
[13] Clerk's Papers at 31-44.
[14] 28 Wash.App. 98, 621 P.2d 1310 (1981).
[15] Report of Proceedings (RP) June 16, 1997 at 80-81.
[16] RP June 17, 1997, Court's Oral Ruling at 4-5.
[17] Clerk's Papers at 45.
[18] RP July 28, 1997 at 86.
[19] RP July 28, 1997 at 18.
[20] Dated July 29, 1997 but stamped as filed on July 28, 1997.
[21] Clerk's Papers at 73.
[22] Clerk's Papers at 72.
[23] Letter to counsel from Supreme Court Clerk.
[24] Petitioner argues that the trial court erred in excluding expert testimony on diminished capacity because (1) the foundational requirements for admitting expert testimony have been satisfied; (2) the expert testimony is otherwise admissible under ER 702; and (3) the exclusion of such testimony deprives Petitioner of his constitutional right to present a defense.
[25] State v. Hamlet, 133 Wash.2d 314, 324, 944 P.2d 1026 (1997) (citing State v. Markle, 118 Wash.2d 424, 438, 823 P.2d 1101 (1992)).
[26] State v. Castellanos, 132 Wash.2d 94, 97, 935 P.2d 1353 (1997) (citing State v. Huelett, 92 Wash.2d 967, 969, 603 P.2d 1258 (1979)).
[27] State v. Ferrick, 81 Wash.2d 942, 944, 506 P.2d 860, cert. denied, 414 U.S. 1094, 94 S.Ct. 726, 38 L.Ed.2d 552 (1973).
[28] See 28 Wash.App. at 104, 621 P.2d 1310 (specific intent is "an intent to produce a specific result," as opposed to an intent to do the physical act).
[29] 127 Wash.2d 490, 502, 902 P.2d 1236 (1995).
[30] 127 Wash.2d at 503, 902 P.2d 1236.
[31] See 28 Wash.App. at 102-03, 621 P.2d 1310. The "Edmon factors" are:

"1. The defendant lacked the ability to form a specific intent due to a mental disorder not amounting to insanity.
"2. The expert is qualified to testify on the subject.
"3. The expert personally examines and diagnoses the defendant and is able to testify to an opinion with reasonable medical certainty.
"4. The expert's testimony is based on substantial supporting evidence in the record relating to the defendant and the case, or there must be an offer to prove such evidence. The supporting evidence must accurately reflect the record and cannot consist solely of uncertain estimates or speculation.
"5. The cause of the inability to form a specific intent must be a mental disorder, not emotions like jealousy, fear, anger, and hatred.
"6. The mental disorder must be causally connected to a lack of specific intent, not just reduced perception, overreaction or other irrelevant mental states.
"7. The inability to form a specific intent must occur at a time relevant to the offense.
"8. The mental disorder must substantially reduce the probability that the defendant formed the alleged intent.
"9. The lack of specific intent may not be inferred from evidence of the mental disorder, and it is insufficient to only give conclusory testimony that a mental disorder caused an inability to form specific intent. The opinion must contain an explanation of how the mental disorder had this effect." (Citations omitted.)
[32] RP July 28, 1997 at 45-46.
[33] RP July 28, 1997 at 86. ("As to Dr. Cripe, first for the record, there was and has been no doubt in this court's mind as to his qualifications as an expert in the medical profession for which he is licensed and demonstrates significant expertise....")
[34] RP June 16, 1997 at 39-40, 44. RP July 28, 1997 at 28-29, 44-46.
[35] RP June 16, 1997 at 44-45,50.
[36] RP July 28, 1997 at 29-30.
[37] RP June 16, 1997 at 29-30.
[38] RP July 28, 1997 at 48.
[39] RP June 16, 1997 at 29-30.
[40] RP July 28,1997 at 54-55.
[41] RP June 16, 1997 at 41-42.
[42] RP July 28, 1997 at 45-46.
[43] RP June 16, 1997 at 34-35; RP July 28, 1997 at 52.
[44] RP July 28, 1997 at 57.
[45] RP July 28, 1997 at 51-53.
[46] Clerk's Papers at 66-67.
[47] 28 Wash.App. at 99-100, 621 P.2d 1310.
[48] 28 Wash.App. at 100-01, 621 P.2d 1310.
[49] 28 Wash.App. at 101-02, 621 P.2d 1310.
[50] Clerk's Papers at 48-49.
[51] 28 Wash.App. at 105, 621 P.2d 1310 ("An irresistible impulse is one induced by a mental disease affecting the volitive powers so that the person afflicted is unable to resist the impulse to commit the act charged against him. He cannot control his own behavior even though his perceptive powers are unaffected and he understands the nature and consequences of the act charged and perceives that it is wrong.").
[52] 28 Wash.App. at 107, 621 P.2d 1310.
[53] Id.
[54] In Edmon, one expert testified; the defendant was not completely denied of a diminished capacity defense because the court allowed expert testimony on the effects of alcohol and lack of sleep on his ability to form intent; and the requisite mental state involved intent, not premeditation.
[55] RP June 16, 1997 at 105.
[56] 127 Wash.2d at 492-94, 902 P.2d 1236. See also State v. Brand, 55 Wash.App. 780, 782-83, 780 P.2d 894 (1989) (Despite "incontrovertible evidence of planning," the court allowed expert testimony that defendant's ability to premeditate the intent to kill his wife was diminished because he suffered from a major depressive disorder and from narcissistic personality).
[57] 100 Wash.2d 417, 670 P.2d 265 (1983).
[58] 64 Wash.App. 511, 515, 827 P.2d 298 (1992), conviction in part, 121 Wash.2d 1, 846 P.2d 527 (1993).
[59] 45 Wash.App. 143, 723 P.2d 1204, review denied, 107 Wash.2d 1014 (1986).
[60] Inclusion of a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, (4th ed. 1994) (DSM-IV) "does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency." DSM-IV, xxvii (1994).
[61] RP June 16, 1997 at 41.
[62] DSM-IV at 654. "Diagnostic criteria for 301.83 Borderline Personality Disorder A pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

"(1) frantic efforts to avoid real or imagined abandonment....
"(2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation
"(3) identity disturbance: markedly and persistently unstable self-image or sense of self
"(4) impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating)....
"(5) recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior
"(6) affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days)
"(7) chronic feelings of emptiness
"(8) inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights)
"(9) transient, stress-related paranoid ideation or severe dissociative symptoms"
[63] "The essential feature of Dissociative Disorders is a disruption in the usually integrated functions of consciousness, memory, identity, or perception of the environment." DSM-IV at 477.
[64] The diagnosis of borderline personality disorder not otherwise specified is not a category listed in DSM-IV.
[65] DSM-IV at 612. "Diagnostic criteria for 312.34 Intermittent Explosive Disorder

"A. Several discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property.
"B. The degree of aggressiveness expressed during the episodes is grossly out of proportion to any precipitating psychosocial stressors.
"C. The aggressive episodes are not better accounted for by another mental disorder (e.g., Antisocial Personality Disorder, Borderline Personality Disorder ...) and are not due to the direct physiological effects of a substance (e.g., a drug of abuse ...)."
Reliable information is lacking, but Intermittent Explosive Disorder is apparently rare.
[66] RP June 16, 1997 at 48, 58.
[67] DSM-IV at 673. 301.9 Personality Disorder Not Otherwise Specified

"This category is for disorders of personality functioning that do not meet criteria for any specific Personality Disorder. An example is the presence of features of more than one specific Personality Disorder that do not meet the full criteria for any one Personality Disorder ("mixed personality"), but that together cause clinically significant distress or impairment in one or more important areas of functioning (e.g., social or occupational). This category can also be used when the clinician judges that a specific Personality Disorder that is not included in the Classification is appropriate."
[68] Clerk's Papers at 43.
[69] RP June 16, 1997 at 71-72.
[70] Resp. to Mot. for Review, App. C at 7.
[71] DSM-IV at 649-50. Diagnostic criteria for 301.7 Antisocial Personality Disorder

"A. There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following:
"(1) failure to conform to social norms with respect to lawful behavior as indicated by repeatedly performing acts that are grounds for arrest
"(2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure
"(3) impulsivity or failure to plan ahead
"(4) irritability and aggressiveness, as indicated by repeated physical fights or assaults
"(5) reckless disregard for safety of self or others
"(6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations
"(7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another
"...."
[72] Clerk's Papers at 44.
[73] Clerk's Papers at 64.
[74] RP June 16, 1997 at 63-64.
[75] See State v. Tyler, 77 Wash.2d 726, 466 P.2d 120 (1970) (court excluded expert opinion based on the defendant's testimony as to the amount of drugs and alcohol he had consumed, which testimony was so vague, indefinite, and uncertain that it provided no basis for a competent medical opinion).
[76] RP July 28, 1997 at 69-70.
[77] See also State v. Moore, 61 Wash.2d 165, 377 P.2d 456 (1963).
[78] RP July 28, 1997 at 53-55.
[79] 81 Wash.2d 942, 506 P.2d 860 (1973).
[80] 81 Wash.2d at 945, 506 P.2d 860.
[81] RP June 16, 1997 at 92-93, 104-06.
[82] State v. Markle, 118 Wash.2d 424, 438, 823 P.2d 1101 (1992).
[83] See RCW 9.94A.390.
[84] "Evidence Rule 702. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
[85] Under Rule 2.5 of the Rules of Appellate Procedure, an "appellate court may refuse to review any claim of error which was not raised in the trial court."
[86] 483 U.S. 44, 55-56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (a state evidentiary rule excluding all post-hypnosis testimony unconstitutionally burdened the defendant's right to testify at trial). See also State v. Baird, 83 Wash.App. 477, 482, 922 P.2d 157 (1996), review denied, 131 Wash.2d 1012, 932 P.2d 1256 (1997).
[87] "WPIC 6.51 EXPERT TESTIMONY A witness who has special training, education or experience in a particular science, profession or calling, may be allowed to express an opinion in addition to giving testimony as to facts. You are not bound, however, by such an opinion. In determining the credibility and weight to be given such opinion evidence, you may consider, among other things, the education, training, experience, knowledge and ability of that witness, the reasons given for the opinion, the sources of the witness' information, together with the factors already given you for evaluating the testimony of any other witness."
[88] 518 U.S. 37, 116 S.Ct. 2013, 2017, 135 L.Ed.2d 361 (1996) (citing Taylor v. Illinois, 484 U.S. 400, 410, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988)).
[89] 28 Wash.App. at 106, 621 P.2d 1310.
[90] "Evidence Rule 401. `Relevent evidence' means having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"Evidence Rule 402. All relevant evidence is admissable, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible."
[91] 28 Wash.App. at 102-03, 621 P.2d 1310 (citing State v. Ferrick, 81 Wash.2d 942, 506 P.2d 860, cert. denied, 414 U.S. 1094, 94 S.Ct. 726, 38 L.Ed.2d 552 (1973); State v. Martin, 14 Wash. App. 74, 538 P.2d 873 (1975); State v. Tyler, 77 Wash.2d 726, 466 P.2d 120 (1970), vacated as to imposition of death sentence, 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756 (1972); State v. Moore, 61 Wash.2d 165, 377 P.2d 456 (1963); see also State v. Cogswell, 54 Wash.2d 240, 339 P.2d 465 (1959); State v. Upton, 16 Wash.App. 195, 556 P.2d 239 (1976); State v. Craig, 82 Wash.2d 777, 514 P.2d 151 (1973); State v. White, 60 Wash.2d 551, 374 P.2d 942 (1962), cert. denied, 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963); State v. Carter, 5 Wash.App. 802, 490 P.2d 1346 (1971)).
[92] 133 Wash.2d at 324, 944 P.2d 1026.
[93] 132 Wash.2d at 97, 935 P.2d 1353.
[1] There is some confusion in the defense theory, stemming from some imprecise language in the experts' reports and testimony, as to whether Ellis's alleged diminished capacity prevented him from premeditating the crime, or having any intent whatsoever to commit the crime. As Ellis does not claim he is insane within the meaning of RCW 10.77, it would appear his theory is actually that he was unable to premeditate the murders of his mother and sister, and therefore cannot be guilty of aggravated murder in the first degree.
[2] The verb premeditate "encompasses the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Brooks, 97 Wash.2d 873, 876, 651 P.2d 217 (1982) (emphasis added). This has been the law in Washington at least since State v. Rutten, 13 Wash. 203, 212, 43 P. 30(1895).
[3] "Alienist" is an old term for psychiatrist.
[4] I can find only one case to the contrary. In State v. Crenshaw, 27 Wash.App. 326, 333, 617 P.2d 1041 (1980), aff'd, 98 Wash.2d 789, 659 P.2d 488 (1983), the Court of Appeals said: "Psychiatric opinion evidence regarding a defendant's mental condition at a particular point in time is admissible when relevant to the question of a defendant's sanity even though the expert witness did not personally observe the defendant at the time of the offense." The only authority the court cited was Upton. The opinion was evidently simply mistaken in its reading of Upton, as the court in that case did in fact require testimonial knowledge.
[5] Although the Court of Appeals in State v. Edmon, 28 Wash.App. 98, 621 P.2d 1310 (1981), attempted to set forth a compendium of foundation requirements for evidence about the mental state of a defendant, the opinion failed to mention the testimonial knowledge requirement, even though the Court of Appeals cited to Craig, Tyler, Moore, Cogswell, and Upton for other holdings. Edmon, 28 Wash.App. at 102-03, 621 P.2d 1310.
[6] Arguably, Ellis's recitation of the facts of the murders to the psychologists is inadmissible hearsay. All that is in the record about the events of the homicide comes from the testimony and reports of the two psychologists. There were no witnesses to the murders other than Ellis. Everything the psychologists know about Ellis's actions comes primarily from what Ellis told them. Thus, to admit the psychologists' testimony of the events of the homicide, as Ellis told those events to them, is to admit hearsay.

Usually, hearsay for the purposes of medical diagnosis or treatment is admissible as an exception to the hearsay rule. ER 803(a)(4) provides:
Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
Thus, the psychologists' description of the events surrounding the murders, as Ellis related those events, would be admissible as substantive evidence to prove the truth of the matter asserted, as what Ellis said can be taken as statements made for the purpose of diagnosis. The justification for this hearsay exception is the presumption the patient has a strong motivation to be truthful in giving information related to treatment or diagnosis.
Precisely the opposite is present here, however. Ellis's motivation is to describe a situation in which his mental state would negate the State's evidence of premeditation. In fact, because he has admitted committing the murders, the only defense he can possibly present to the first degree murder charge is lack of premeditation. Thus, the usual index of reliability justifying hearsay testimony of medical personnel is entirely absent in this case. If anything, what Ellis told the psychologists about the events of the murders has a high index of unreliability. In the words of one of the leading treatises on evidence:
[S]tatements [made for purposes of medical diagnosis] may be extremely unreliable as evidence of the facts related, since the condition for which the patient is consulting the psychiatrist may have impaired the patient's perception, memory or veracity.
5 WEINSTEIN'S FEDERAL EVIDENCE § 803.09[8], at 803-47 (2d ed.1998).
[7] Examples of such testimony follow:

So we have an individual whose perceptional process, whose interpreting process, his decision making capacity and his ability to properly regulate his behavior, was [sic] severely compromised as a direct result of this ongoing personality disturbance, severe in nature, and quite uncooling.
Report of Proceedings (June 16, 1997) at 52-53 (Dr. Whitehill).
We are talking about extreme pathology here, and breakdowns of mental observations that are not just an overreaction. We are talking about defects of mental functioning. I thought of it this way: Perhaps this would be useful to understand where I am coming from on this. We all sort of have little buttons on us, little red buttons, and if someone comes over and pushes it they can set us off, and get certain reactions. But as we grow and develop and your mind sort of develops, we sort of learn how to work around those, and control those through the powers of mind.
We are not talking about a little button. We are talking about a big button here, a button that is just the result of unspeakable things. And if this man gets into certain situations, and that big abnormal button gets pushed, you get big abnormal behavior. And so I don't think it's a fair characterization to speak of it as just a reaction. We are talking about an aberrant psychology.
Report of Proceedings (June 16, 1997) at 73-74 (Dr. Cripe).
Q. [The State] Now, tell us, please, what symptoms exactly were manifested when Mr. Ellis killed.
A. [Dr. Whitehill] Well, one dimension of the borderline adaptation, his intention on remitting emotionality unregulated in nature.
Q. So emotionality, intention.
A. Intention.
Q. Unregulated. Any others?
A. Impulsivity with respect to behavioral regulation.
Report of Proceedings (June 16, 1997) at 55.
[8] Dr. Cripe's knowledge of what happened the evening of the murders comes from Ellis's self-report of how he felt and what he did.
[9] The suggestion of automatism appears also in Dr. Cripe's written report of August 7, 1996, where he said Ellis's "extreme actions were the result of complicated forces and not an act of normal free will." Clerk's Papers at 63. Neither Dr. Cripe nor Dr. Whitehill has formally diagnosed Ellis as having been an automaton when he killed his mother and half-sister, and Ellis has not raised automatism as a defense.
[10] Dr. Cripe here is evidently expressing his disagreement with the legal standard for either intent or premeditation. He is entitled to his opinion.
[11] Here again Dr. Cripe indicates he has not focused upon the legal definition of premeditation, but has instead considered it only in the lay sense of having planned something well in advance.
[12] Dr. Cripe continues to display the incongruity of his testimony about Ellis's mental state with the legal question of premeditation. Ellis surely had more time to premeditate the killing of his half-sister than of his mother. Even from his own description of his actions to his psychologists, he had time to deliberate before picking up the breadboard once again and killing his little half-sister.
[13] The reference to "free will" is confusing. Ellis has not claimed he was acting as an automaton, yet the essence of the testimony of both psychologists is that Ellis had no control of himself, and for that reason ought not be held responsible for murder in the first degree.
[14] People v. Moran, 249 N.Y. 179, 163 N.E. 553 (1928). This was a case involving feebleness of mind rather than a personality or emotional disorder. It offers only tangential support for the holding in Ferrick, where the defendant claimed a mental disease.
[15] State v. DiPaolo, 34 N.J. 279, 168 A.2d 401 (1961).
[16] People v. Wells, 33 Cal.2d 330, 202 P.2d 53, cert. denied, 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510 (1949).
[17] Cal.Penal Code § 28 reads, in part:

(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.
(b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing.
(Emphasis added.) Two commentators on the California legislation noted:
The Legislature heard ample and scientifically sound expert testimony that convinced it that even severe mental disabilities virtually never negate mens rea. Mental disabilities may give someone a crazy motive for forming an intent, or may to some extent compromise a person's ability to control himself. However, mental disabilities do not prevent the formation of the mens rea except in exceptionally rare cases, such as Wetmore [People v. Wetmore, 22 Cal.3d 318, 583 P.2d 1308, 149 Cal. Rptr. 265 (1978)], where the alleged burglar's delusional belief that he was in his own apartment negated the felonious intent (to steal) that is part of the mens rea of burglary.
Stephen J. Morse & Edward (Ned) Cohen, Diminishing Diminished Capacity in California, 2 CAL. LAW. 24, 25 (June 1982).
[18] Dr. Whitehill apparently attempted to clarify this point later in his testimony:

In my experience with Mr. Ellis, and in my experience of persons like him who have committed severely violent acts, and who manifest severe personality disorders, that which have individuals who become, or who display what we could call borderline rageborderline not in the sense that it's almost rage, this is clearly extremely rageful behavior. Borderline rage is notthis is rage that accompanies the borderline personality. And there aremy diagnosis of Mr. Ellis was not that of borderline rage. It was borderline personality NOS, or not otherwise specified, which there are a variety of elements present, including the borderline and antisocial behavior.
Report of Proceedings (June 16, 1997) at 48.
[19] Dr. Whitehill wrote: "In particular, I have argued that Mr. Ellis's mixed personality disorder and intermittent explosive disorder were in acute symptomatic presentation at the time of the slayings of his mother and half-sister." Clerk's Papers at 52. He "presumes" these symptoms were present, resulting in "severe impairment" on the night of the murders because the murders occurred. Id. If Ellis had not been in "acute symptomatic presentation" he presumably would not have committed the murders.
[20] "[T]here is no scientific basis for measuring a person's capacity for self-control or for calibrating the impairment of that capacity. There is, in short, no objective basis for distinguishing between offenders who were undeterrable and those who were merely undeterred, between the impulse that was irresistible and the impulse not resisted, or between substantial impairment of capacity and some lesser impairment." Richard J. Bonnie, The Moral Basis of the Insanity Defense, 69 A.B.A. J. 194, 196 (1983).
[21] One wonders if Ellis's mental disorders would have prevented him from premeditating coolly to kill his mother and sister, or whether his mental disorders prevented him from premeditating only when he was "rageful."