

# THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, ) | No. 76372-5-I |
| ) | |
| Respondent, ) | |
| ) | |
| v. ) | UNPUBLISHED OPINION |
| ) | |
| CJ COPELAND, ) | |
| ) | |
| Appellant. ) | |
| ) | FILED: July 30, 2018 |

SPEARMAN, J. — An out of court statement offered to prove the truth of the matter asserted is generally inadmissible hearsay. But, under ER 801(d)(1)(ii) such a statement is not hearsay, and admissible as a prior consistent statement, if it is offered to rebut an inference of recent fabrication or improper influence or motive. In this case, CJ Copeland was found guilty, after a jury trial, of three counts of assault in the second degree and two counts of assault in the third degree, each with a domestic violence allegation. Copeland appeals, contending he is entitled to a new trial because the trial court erroneously admitted certain statements as prior consistent statements. We disagree that the trial court erred in admitting the statements, but even if it did any error was harmless. Affirmed.

## FACTS

Jill Cutler and Brian Hagins were married for 23 years, and have four children: Hailey, Niam, Brona, and T.H. Cutler and Hagins were active members of the Mormon Church. Hagins worked outside the home and Cutler was a homemaker.

In 2011, Cutler's best friend McKala Copeland passed away unexpectedly. In 2012, Cutler and Hagins agreed to take in her children CJ Copeland and Alex Hunter until they could get back on their feet. CJ Copeland was 18 years old and Alex Hunter was 15 years old.

At the time Copeland and his brother moved in, Cutler and Hagins' marriage was already falling apart. In May 2013, Cutler secretly began a sexual relationship with Copeland. One day, Brona walked into the upstairs bathroom and found her mother and Copeland in an intimate embrace. Cutler told Brona it "kind of just happened" and that it wouldn't happen again. Verbatim Report of Proceedings (VRP) (1/11/17) at 435. Brona tried unsuccessfully to convince her parents to make Copeland and his brother move out. Eventually, Brona told her father what she saw in the bathroom, but he didn't believe her. In October 2013, Brona went to live with a friend.

Shortly thereafter, Cutler and Hagins got into an argument about Brona and Cutler claimed Hagins shoved her. She left and went to a hotel, where she met Copeland. After discussing the situation with Copeland, Cutler called Hagins and told him to get out of the house. When she returned the next day, Hagins was gone. After that, the only people living in the house were Cutler, Niam, T.H., Copeland and Alex. Cutler subsequently filed a protection order against Hagins. Cutler had two friends write declarations in support of the protection order; Jenny Johnson, who attended Cutler's church, and Chyna Gates, who is Copeland's half-sister. Cutler and Hagins' divorce was finalized in June 2014.

According to Cutler, Copeland started physically abusing her within weeks after they began their sexual relationship. He was also extremely controlling and paranoid

that she was cheating on him. He made her ask permission to go to the store or even to get out of bed or go to the bathroom. He imposed strict time limits on her outings and forced her to text him photos to prove she wasn't cheating. If she did not answer his calls on the first ring, he would accuse her of cheating. He constantly checked her cell phone to make sure she was not talking to men or deleting texts or emails. He told Cutler that if she left him or had him arrested, his friends would rob her and burn her house down. He also threatened to have Cutler or her children put in jail. In addition, Cutler found out Copeland was cheating on her. She was angry about the cheating and thought it was unfair. She told him to stop, but he didn't. Cutler also provided Copeland with substantial financial support, even though he didn't work or help around the house. Despite all this, Cutler said she loved him.

Cutler claimed Copeland continued to abuse her physically and verbally throughout the duration of the relationship. She recalled seven incidents of particularly severe abuse, which the State later charged as seven counts of assault.

Count One: In June 2014, Cutler's daughter, Hailey, used her boyfriend's phone to send Cutler a text. Cutler did not want Copeland to see that she had received a text from a man's phone, so she deleted it. But Cutler was afraid that Copeland would find out, so when Hailey texted her a joke photo, she decided not to delete it. When Copeland saw the text, he accused Cutler of having an affair. Cutler denied this, but Copeland insisted he would make her tell the truth. Copeland smashed her phone and began punching her. Cutler continued to deny the accusations, so Copeland used a lighter to heat a large spoon until it was red hot, and burned her bottom with the spoon until the skin turned black. Cutler cried and begged for him to stop, but she continued to

deny the accusations, so he burned her bottom again. Cutler was left with permanent red scars.

Count Two: In August 2014, Copeland went out and left Cutler home alone. He returned at midnight "really drunk and really high" and accused Cutler of cheating on him while he was gone. When she denied the accusations, he beat her with the buckle end of the belt, punched her repeatedly, and held the knife to her throat while threatening to kill her. He bit both of her ears so hard that they turned black with bruises, then pinned her down and started strangling her. He then picked her up and threw her down repeatedly, tore off her clothes, pushed her outside, and ordered her to go to the convenience store to buy cigarettes even though she was naked and had no money. She protested, and about five minutes later he let her come back inside.

Count Three: On Christmas Day 2014, Copeland and Alex took Cutler's car and went to their father's house. Cutler's children were with Hagins, so Cutler was alone. Copeland said they would be back by 1:00 p.m., but they didn't get back until 11:30 p.m. Copeland appeared intoxicated. He was angry at Cutler for texting to ask when he was coming home. He punched her in the face repeatedly, breaking her nose and giving her a black eye. He pulled out a large kitchen knife and held it to her throat. She was afraid he would kill her, so she slapped him in the face, hoping this would get him to stop. But he pinned her to the ground and strangled her until she saw stars and everything went black.

Count Four: In February 2015, Copeland and Cutler went to a bar. When they returned home, Copeland told Cutler he didn't like her attitude that night. He pulled off her clothes, knocked her to the ground, pulled up her underwear so hard it injured her,

and pulled her around by her hair. He then began punching her in the face, warning her that the beating would be worse if she tried to shield herself. When he was done, Cutler's nose was broken and her eye was swollen shut. A few days later, Cutler decided to begin documenting the abuse by using her cell phone to take pictures of her injuries. To avoid detection, she emailed the photos to herself and then deleted them from her phone.

Count Five: On September 12, 2015, Copeland gave Cutler permission to drive T.H. to a friend's house. Cutler took her wallet with her, and returned as quickly as possible. When she got back, Copeland immediately accused her of stealing her own debit card from him. He threw her clothes in the tub, saying he was going to burn them and destroy her paintings. He strangled her, pulled up her underwear hard, bit her, dragged her around by her hair, slapped her, and cocked his fist at her face while threatening to kill her. He then strangled her until everything went black.

Count Six: On September 23, 2015, Copeland told Cutler to do what he said or he would kick her and her kids out of the house. In November 2013, Copeland had forced Cutler to sign a statement saying that she had given the family home to him, and he frequently used it to threaten and control her. Copeland took her wallet and said she had until noon to pack her bags. Cutler tried to grab the paper, and that infuriated Copeland. He smashed her head on the floor and strangled her twice. She started having what she described as "seizures" in her legs, something that had never happened before. But Copeland forbade her from going to a doctor, saying "[t]here can never be proof." VRP (1/10/17) at 260. Cutler photographed her injuries.

5

Count Seven: In October 2015, Copeland ordered groceries online to be delivered. Copeland was asleep when the delivery man came, and Cutler wasn't able to wake him up. Copeland forbade her from speaking to men, so she was afraid to answer the door. She asked the delivery man to leave the groceries on the front porch, but he said his job required him to bring the groceries to the kitchen. After he left, Copeland came downstairs and accused Cutler of flirting. He punched her, slapped her, and dragged her around by her hair. She continued to deny Copeland's accusations, so he dragged her upstairs and beat her with belts. He threatened to cut all her hair off, then hog-tied her with belts and dragged her back downstairs by her hair. He took her wallet and keys and threatened to total her car. He pulled her pants down, continued to beat her with belts, and threatened to burn her again. Cutler photographed her injuries.

There were no direct witnesses to the abuse that Cutler described. Hagins did not see any signs of abuse or serious injury from May through October 2013, when he moved out of the house. But T.H., Brona, and Hailey all noticed obvious serious injuries, which Cutler attributed to a variety of accidents.[1] T.H. said he saw his mother with bruising "[m]ost of the time." VRP 1/10/17 at 384. Sometimes T.H. would ask Cutler what happened, and she would say she was just clumsy. One time T.H. asked how she got a black eye, and Cutler explained that she dropped a board on her face while working on a chicken coop in the backyard. T.H. accepted Cutler's explanation at that time. When Brona stopped by to pick up T.H., she also noticed that Cutler had a black eye. She asked T.H. what happened, and he repeated the chicken coop story. Another time, Brona noticed that Cutler's nose appeared to be freshly broken. When Brona

---

[1] Cutler's daughter Niam has severe developmental disabilities and did not testify.

6

asked Cutler what happened, Cutler explained that she accidentally hit her nose on a board in the bathroom closet. Brona didn't think these explanations made sense.

In October 2014, Hailey noticed that Cutler had dark purple bruises that she appeared to be trying to hide. Cutler told Hailey that she was just clumsy. In March or April 2015, Hailey noticed that Cutler had black eyes and that her nose was visibly broken. When asked what happened, Cutler repeated the chicken coop story. In May 2015, Hailey walked into the bathroom and noticed severe bruising on Cutler's legs, bottom, and lower back. Cutler explained that she had slipped and fallen while helping Niam into the car. In August 2015, Hailey again noticed that her mother had black eyes and a broken nose. This time, Cutler claimed that she hit her nose while closing the trunk of the car. Hailey did not believe any of these explanations.

In contrast, when confronted by Chyna Gates and Jenny Johnson about her injuries, Cutler said Copeland was abusing her.

In May 2014, Cutler was at a funeral for Gates's son. When Gates asked Cutler how she got a black eye, Cutler initially claimed she hit her eye on a car door. Later that day, Gates asked Cutler point-blank if Copeland was abusing her. Cutler said Copeland gave her the black eye but begged Gates not to tell anyone. Gates agreed to Cutler's request, but she did confront Copeland directly. He told her to mind her own business. In March 2015, Cutler attended Gates' baby shower while Copeland sat outside in the car. Gates noticed that Cutler was acting timid and had two black eyes, but Gates wasn't able to ask Cutler about her injuries at that time. A few weeks later, Gates saw Cutler at a family party and asked what was going on. Cutler said things with Copeland were getting worse. She said he had been hitting her, beating her, burning her with

spoons, and accusing her of cheating. Cutler also said Copeland threatened to tell people she was doing drugs and abusing the kids and the dogs if she told anyone what he had been doing to her. Gates assured her that Copeland's threats were empty, and she urged Cutler to report the abuse. But Cutler told Gates she wasn't ready. She said still loved Copeland and didn't want him to go to jail. Gates believed it would be pointless to report the abuse because Cutler would just deny it.

In the spring of 2015, Jenny Johnson stopped by Cutler's house to check on her. Johnson had been trying to contact Cutler since Hagins moved out in October 2013. Johnson was concerned for Cutler's welfare, as she had stopped going to church, responding to Johnson's texts, or answering the door even when she appeared to be home. But this time, Cutler was home alone, and she let Johnson come in. Johnson said Cutler had lost weight and appeared skittish and anxious. Johnson asked Cutler point blank if she was in a relationship with Copeland. Cutler appeared "stunned" and admitted that she was. Johnson then asked if the relationship was abusive, and Cutler said yes. Cutler said her nose had been broken and that she had been knocked unconscious and beaten with belts. Johnson expressed concern about what Cutler's children were seeing, and Cutler said, "'No, he's so careful. My kids have no idea this is going on, and I can't let them know.'" VRP (1/11/17) at 490. Johnson urged Cutler to report the abuse, but Cutler said she couldn't because "[h]e'll kill my kids, or he'll kill me … I can keep suffering this to protect my kids." Id. at 491. Johnson said she did not report the abuse herself because, based on her domestic violence training, she believed Cutler would likely deny it. Johnson was also concerned for Cutler's safety.

On October 10, 2015, Gates received a phone call from Cutler. Gates thought Cutler sounded "rushed and scared." VRP (1/11/17) at 476. Cutler told Gates that the previous day, Copeland threatened to shoot her son T.H. as he got off the school bus and to hire a hit man to kill Brona. Copeland told Cutler there were so many murders in Lynnwood that no one would ever suspect him. Cutler said "At that point, I knew that was my turning point. I didn't care what happened to me. He could kill me, but he just threatened two of my children, and that was the end." VRP (1/11/17) at 283. Cutler allowed Gates's husband to call the police while Gates drove to meet Cutler at her house.

Deputy Quinonez responded to Cutler's home that day. He said Cutler appeared traumatized. Cutler told Deputy Quinonez about the abuse. She raised her shirt and lowered her pants to reveal large bruises all over her body. Deputy Quinonez called for a female deputy to photograph the bruises. Cutler showed him belts and said Copeland used them to beat her. Deputy Quinonez collected them as evidence. He also interviewed T.H. in the home. After his initial investigation was complete, Deputy Quinonez located Copeland and arrested him.

A few weeks after Copeland's arrest, Cutler went to her physician Dr. Denise Hastings. When Cutler saw Dr. Hastings in early 2015, she reported no abuse and the doctor observed no injuries at that time. But this time, Cutler said she had pain in her leg which she claimed was inflicted by a young nephew at her home. The doctor suggested physical therapy or acupuncture. Two months later, Cutler returned and told Dr. Hastings she wanted to gather evidence for trial against the person who had been abusing her. The doctor ordered an x-ray of her nose, which came up as consistent with

multiple previous fractures. She also ordered a nerve conduction analysis on Cutler's leg, but the test was unable to detect nerve damage.

Based on Cutler's description of severe physical abuse inflicted during the seven incidents described above, Copeland was charged with five counts of assault on the second degree - domestic violence, and two counts of assault in the third degree—domestic violence. The jury found Copeland guilty of third degree assault–domestic violence on counts I and VII, and guilty of second degree assault–domestic violence on counts II, IV, and VI. But it acquitted Copeland of second degree assault–domestic violence on counts II and V. Copeland appeals.

## DISCUSSION

Copeland contends that the trial court erred in admitting Cutler's statements to Gates and Johnson pursuant to ER 801(d)(1)(ii). A trial court's evidentiary rulings are reviewed for abuse of discretion. Peralta v. State, 187 Wn.2d 888, 894, 389 P.3d 596 (2017) . "We will reverse a trial court's evidentiary ruling "'only when no reasonable person would take the view adopted by the trial court.'" Id. (quoting State v. Ellis, 136 Wn.2d 498, 504, 963 P.2d 843 (1998).

Hearsay is an out of court statement offered in evidence to prove the truth of the matter asserted. ER 801(c). "Relevant testimony may be excluded from trial if it is hearsay." State v. Garcia, 179 Wn.2d 828, 845, 318 P.3d 266 (2014). Under ER 801(d)(1)(ii), a witness's prior statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper

10

influence or motive...." "While the witness' prior consistent statements are not admissible to prove that the in-court allegations are true, the statements are admissible to rebut a suggestion of recent fabrication." State v. Makela, 66 Wn. App. 164, 169, 831 P.2d 1109 (1992) (citing State v. Bargas, 52 Wn. App. 700, 702, 763 P.2d 470 (1988). "Cross examination alone does not justify admission of prior consistent statements; the questioning must raise an inference sufficient to allow counsel to argue the witness had a reason to fabricate her story later." Bargas, 52 Wn. App. at 702-03. "Further, a charge of recent fabrication can be rebutted by the use of prior consistent statements only if those statements were made under circumstances indicating that the witness was unlikely to have foreseen the legal consequences of his or her statements." Makela, 66 Wn. App. at 168-69.

Prior to trial, the State indicated that it would call Gates and Johnson as witnesses to testify that Cutler told them Copeland was abusing her. Copeland moved to exclude this testimony as inadmissible hearsay. The State sought to have Cutler's statements admitted as prior consistent statements under ER 801(d)(1)(ii). Copeland argued that Cutler's statements to police were not recent fabrications. Rather, Cutler was motivated to lie for various reasons throughout the relationship, and these motives existed prior to Cutler's abuse allegations. Therefore, according to Copeland, her statements to Gates and Johnson are not admissible as prior consistent statements.

The trial court initially reserved ruling on the matter. But after Cutler testified, the court revisited the issue and found the statements admissible under ER 801(d)(1)(ii). The court acknowledged that on cross examination, Cutler had testified to various motives to get Copeland out of her home, such as his chronic infidelity and his financial

dependence on Cutler, and that these motives existed prior to Cutler's statements to Gates and Johnson. But the court noted that Cutler had also testified to a "turning point" that caused her to report the abuse -- the moment when Copeland threatened to kill T.H. and Brona. VRP (1/10/17) at 283. The court found that a reasonable juror could find that this alleged threat provided Cutler with a motive to fabricate the allegations against Copeland, and if so, this motive arose after Cutler's statements to Gates and Johnson. Thus, those statements could rebut an inference that Cutler fabricated the abuse allegations because of Copeland's threat to kill her children. The court reasoned as follows:

> A reasonable juror, or 12 of them, might well conclude that what actually happened was she was afraid of the defendant and afraid of being prosecuted for rape of a child and that only when her concern for the safety of her own children outweighed her concern for her personal well-being did she then decide to report it.
>
> At any rate, that's what she said, and I can't say she could not be believed. The jury is entitled to do what the jury is entitled to do, and they are entitled to believe her or not believe her and believe parts of what she says or not parts of what she says.
>
> But it may well be that the jury will conclude that any motive to lie, if that's what it was, occurred then. And if that's the case, then what she said to Chyna Gates and Jenny Johnson certainly were prior consistent statements, because that occurred before that point.
>
> And one of the difficulties here is, in sorting out what -- what 801(d) requires in this case, is that there were many items of evidence that could go either way.
>
> But in this case, I think the correct analysis requires me to admit evidence of prior consistent statements, because what the State is seeking to do amounts to no more than to rebut the suggestion that -- or the inference that a reasonable person could conclude, in particular, following cross-examination, that, far from lying right now on the stand, she lied previously to everybody else except Jennifer Johnson and Chyna Gates.
>
> ...

12

And the mere fact that other motives could exist to lie prior to her stated motive to lie doesn't detract from a finding that statements to the effect that "he's beating me," ... do fairly rebut a charge of recent fabrication ..., which charge is contained inside cross-examination, about opportunities when she could have disclosed the assaults but did not.

And because a reasonable juror could see it that way and because that evidence is now in front of the jury and was pointed to, I would say, with some effect in cross-examination, the proffered evidence is admissible pursuant to 801(d), and I will permit it.

VRP (1/11/17) at 461-62.

Copeland argues on appeal, as he did below, that because he did not claim that Cutler's statements to police or her testimony at trial were recent fabrications, the statements Cutler allegedly made to Gates and Johnson were not prior consistent statements. Rather, Copeland's defense was that Cutler's allegations should not be believed because she was motivated to lie for multiple reasons that existed throughout her relationship with Copeland. In support, he relies primarily on Bargas, 52 Wn. App. 700 and Tome v. United States, 513 U.S. 150, 115 S.Ct. 696, 130 L. Ed. 2d 574 (1995).

Both cases are distinguishable. In Bargas, the defendant was charged with first degree rape of J.L. After cross examination of the alleged victim, the State offered the testimony of the investigating officer regarding details of J.L.'s statement at her initial interview. Bargas, 52 Wn. App. at 702. The State argued that because the defense's cross examination raised the inference that J.L. "'was not being completely truthful[,]'" the testimony was admissible as a prior consistent statement. Id. at 703. The trial court admitted the testimony over Bargas' objection. On appeal, we held that this was error because the cross examination did not raise an inference that she fabricated a story after her statements to the officer. Rather, the defense theorized that she fabricated her

13

story from the inception. And the defense's attempt to point out inconsistencies in her testimony did not raise an inference of recent fabrication. Id. at 703.

Bargas is inapposite because in this case the trial court did not admit the prior statements merely because the cross examination raised an inference that the witness was untruthful. Instead, the court specifically found the statements admissible because Cutler's testimony raised an inference of recent fabrication.[2]

Copeland's reliance on Tome fails for the same reason. In that case, the defendant was charged with felony sexual abuse of his four year old daughter, A.T. The child's parents were engaged in a custody dispute and the defense argued that the allegations were fabricated so that A.T. could live with her mother. Tome 513 U.S. at 153. Over defense objection, the trial court admitted the testimony of six adult witnesses who recounted previous statements by A.T. that were consistent with her testimony at trial that she had been improperly touched by her father. It was undisputed that the alleged prior statements were made after the child's alleged motive to fabricate the allegations arose. Nonetheless, the trial court agreed with the government that the testimony was admissible as a prior consistent statement because it rebutted the implicit charge that A.T. had a motive to lie so she could live with her mother. On appeal, the United States Supreme Court held that this was error, because the rule "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements

---

[2] Copeland also argues that Bargas is persuasive authority because, under the trial court's analysis, the inference of recent fabrication did not arise from his cross examination of Cutler, but from the State's direct examination of her. We reject the argument because he cites no authority for the proposition that the inference of recent fabrication must arise solely from evidence elicited on cross examination. Moreover, the rule permits the admission of prior consistent statements for "an . . . implied charge against the declarant of recent fabrication or improper influence or motive. . . ." (Emphasis added); ER 801(d)(1)(ii); State v. McWilliams, 177 Wn. App. 139, 148, 311 P.3d 584 (2013).

were made before the charged recent fabrication or improper influence or motive." Id. at 167. Like Bargas, Tome is distinguishable because here, the trial court found that prior statements were before the motive to fabricate, i.e., the threat to kill T.H. and Brona, arose.

The difficulty in this case, as Copeland argues and the State does not dispute, is that Cutler had many motives to fabricate allegations in order to get Copeland out of the house, some of which existed prior to the alleged prior statements to Gates and Johnson. But a prior consistent statement is not inadmissible merely because multiple motives to lie existed at the time the statement was made. Makela, 66 Wn. App. at 169, and McWilliams, 177 Wn. App. 139 are instructive.

In Makela, J alleged that the defendant had molested her as a child several years earlier. The defense theory was that J fabricated the allegations from the time she was 9 years of age, but he also alleged several additional motives that arose around the time the abuse was reported. The trial court permitted three of J's childhood friends to testify that she had disclosed the abuse to them long before it was reported to the police. Id. at 167-68. The defendant argued that this was error because, although prior consistent statements are admissible to rebut a charge of recent fabrication, J also had a motive to fabricate when she made those disclosures. Id. at 172-73. The court stated:

> The mere assertion that motives to lie may have existed at the time of the prior statement is insufficient to prevent their admission, The trial court must decide, as a threshold matter, whether the proffered motive evidence rises to the level necessary to exclude the prior consistent statement.... This is not to say that the party against whom the prior statements are offered may not present his or her theory that the motive to fabricate existed when the prior statements were made. Both the prior statement and the proffered motive evidence may be presented to the jury, as was done in this case.

15

> We hold that once the trial court has made the threshold determination that the proffered motive evidence does not rise to the level necessary to <u>exclude</u> the prior statement, it is for the jury to weigh the testimony against the opposing party's theory that the victim was motivated by something other than the truth to make the statement.

<u>Id.</u> at 173-74. Because the proffered motive evidence did not rise to the level necessary to exclude the prior consistent statement, there was no error.

In <u>McWilliams</u>, the defendant was charged with assault. His co-defendant reached a plea deal and testified against him. The defense's cross examination implied that the codefendant fabricated his story by asking whether his plea agreement allowed him to reduce his sentence in exchange for testimony against the defendant. The trial court then permitted the investigating detective to testify that the co-defendant's testimony was consistent with what he told her regarding the defendant's involvement in a fistfight at the location of the shooting. <u>Id.</u> at 146. On appeal, the defendant argued that this was error because the statement was made after a motive arose for the co-defendant to fabricate a story blaming him for the crime. <u>Id.</u> at 147. The court stated that "[c]ross-examination that merely attempts to point to inconsistencies in the witness's testimony does not raise an inference of recent fabrication and does not justify admission of prior consistent statements." <u>Id.</u> at 148. But "if cross examination raises an inference "'that the witness changed [his] story in response to an external pressure, then whether that witness gave the same account of the story prior to the onset of the external pressure becomes highly probative of the veracity of the witness's story given while testifying.'" <u>Id.</u> (quoting <u>State v. Thomas</u>, 150 Wn.2d 821, 865, 83 P.3d 970 (2004)). Citing <u>Makela</u>, the court held that even though the defendant had a motive to lie

from the time he initially interacted with police, that generalized motive did not require exclusion of his prior statement to the detective. Id. at 149.

Under these cases, the fact that a witness has multiple motives to fabricate, is not, by itself, a basis to exclude alleged prior consistent statements even though some of the motives existed before the purported statements were made. Instead the trial court must decide, as a threshold matter, whether the proffered motive evidence rises to the level necessary to exclude the prior statement. If it does not, then each party may present its theory regarding the witness's motive to fabricate and the credibility of the prior statements is a question for the jury.

In this case, the trial court appears to have found, similar to the circumstances in McWilliams, that the motives related to Copeland's mistreatment of Cutler were generalized motives that did not rise to a level that required exclusion of the prior statement. The court cited Cutler's testimony that the specific threat to kill T.H. and Brona was "different" from the other threats and was a "turning point" in her decision to report the alleged abuse. VRP (1/10/17) at 283-84. It found that this alleged threat could give rise to an inference that Cutler was motivated to fabricate the allegations against Copeland and the prior statements rebutted that inference. Accordingly, it admitted the prior statements and left it to the jury to weigh the credibility of Cutler's testimony

Copeland contends the trial court's decision was an abuse of discretion because the evidence at trial did not support the "turning point" theory. He points out that Cutler testified of threats to harm the children before the alleged statements to Gates and Johns. He cites Cutler's testimony that throughout the relationship she was motivated to stay with Copeland to protect her children; that Copeland threatened to have T.H. and

Brona put in jail or foster care; and Gates' testimony that Cutler said she was afraid that if she left Copeland, he would kill her or the kids. Copeland notes that Cutler also testified to the contrary, stating that Copeland loved her children and was kind to them. According to Copeland, this testimony undercuts the trial court's finding that the threat to harm the children was a significant departure from the generalized threats Copeland had been allegedly making throughout the relationship and before the alleged statements to Gates and Johnson.

Copeland is correct that the trial court did not explicitly address these specific prior threats in its analysis, but the record shows that Copeland's threats to shoot T.H. when he got off the school bus and to hire a hit man to kill Brona were significantly more specific and violent than his previous threats that mentioned the children. On this record, we cannot say that no reasonable person would take the view adopted by the trial court. Moreover, Cutler did not admit the allegations until pressed by Gates and Johnson, and even then begged them not to call police. This indicates that at the time Cutler made the statements to Gates and Johnson, she did not foresee the legal consequences. Accordingly, we conclude the court did not abuse its discretion in admitting evidence of Cutler's prior statements to Gates and Johnson.[3]

But even if we were to conclude that the trial court erred in admitting this evidence, we would reach the same result because any error was harmless. "We will not reverse due to an error in admitting evidence that does not result in prejudice to the

---

[3] Copeland also argues that the State improperly used the statements as substantive evidence of the alleged crimes, rather than limiting their use to rebutting a claim of recent fabrication. But Tome stated that the rule "permits prior consistent statements to be used for substantive purposes after the statements are admitted to rebut the existence of an improper influence or motive, ..." which is why it is important to insure that the evidence was properly admitted in the first place. Tome, 513 U.S. at 162-63.

18

defendant." Thomas, 150 Wn.2d at 871 (citing State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). "[E]rror is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981) (citing State v. Cunningham, 93 Wn.2d 823, 613 P.2d 1139 (1980).

Copeland calls Cutler's credibility into question, noting that there were no direct witnesses to her claims of abuse. But Cutler's testimony regarding the physical abuse was corroborated by photographs of her injuries, which were taken during the time Cutler said Copeland was abusing her. The photos reflected the injuries she said she suffered, including severe bruises and spoon-shaped burns on her bottom. And an x-ray ordered by Cutler's doctor was consistent with multiple nasal fractures. In addition, Cutler's testimony was corroborated by the testimony of Hailey, Brona, T.H., and Gates, who said Cutler had visible injuries such as black eyes, a broken nose, and severe bruising during the relevant time period. Everyone except young T.H. was highly skeptical of Cutler's explanations for her injuries. And there was testimony that Cutler never had injuries like that before she was with Copeland or after he had been arrested. Furthermore, there were marks on Cutler's bedroom ceiling, walls, and bedframe consistent with belt strikes.

There was also testimony that corroborated Cutler's claims regarding Copeland's controlling behavior. T.H. testified that he saw his mother ask Copeland permission to go to the store or go outside, and Johnson testified that Cutler asked Copeland for permission to go dress shopping with her. Gates testified that Copeland called Cutler when they went out briefly to the store, and that he was angry and demanding to know

why they had been gone so long. She also testified that Copeland was "standing guard" outside when Cutler was at a baby shower. Johnson corroborated Cutler's testimony that Copeland isolated her, noting that Cutler stopped going to church and avoided answering the door or responding to her texts.

We conclude that the trial court did not abuse its discretion in admitting the challenged testimony and if there was any error it was harmless.

Affirmed.

Spearman, J.

WE CONCUR:

Trickey, J.

Dwyer, J.